**In re Dan D. WEINER, Respondent.**

**No. 58923.**

Supreme Court of Missouri,
En Banc.

March 14, 1977.

Thomas P. Meade, Sp. Counsel Advisory Commission, Missouri Bar, Palmyra, for informant.

Steven J. Stogel, Clayton, for respondent.

SEILER, Chief Justice.

This is a disciplinary action involving rule 5.19, which deals with professional misconduct in another state. Respondent, Dan D. Weiner, age 44, is a member of both the Ohio and Missouri bars who practiced in Ohio, not Missouri. He was suspended in Ohio for an indefinite period, *Dayton Bar Association v. Weiner*, 40 Ohio St.2d 7, 69 Ohio Op.2d 83, 317 N.E.2d 793 (1974), which under the Ohio rules meant suspension for at least two years from the date of the ruling, October 16, 1974. The matter first came before us in *In re Weiner*, 530 S.W.2d 222 (Mo. banc 1975), in which we considered the question of to what extent we should rely on the Ohio decision when deciding whether discipline is called for in Missouri for the acts and omissions which took place in Ohio.

As will be seen from our earlier decision, *In re Weiner*, supra, at 225, it appeared that the Ohio authorities probably would not have disciplined respondent beyond a public reprimand had it not been for their belief that he had applied $480 which had been deposited with him for another purpose to his fee without his clients' consent. As reported in our earlier decision, respondent asserted that in the course of cleaning out his office shortly after the Ohio suspension he ran across a tape recording of an office conference during which his clients authorized and consented to his application of the above mentioned $480 to the fee. The Ohio court refused to hear this newly discovered evidence but we saw "no reason why we should not do so in deciding the important question of whether respondent has properly conducted himself as a member of our bar and whether discipline is necessary to protect the public interest." 530 S.W.2d at 225.

Therefore, we ordered an evidentiary hearing in front of a master before making our final determination. The hearing has been held. It took place in St. Louis. The witnesses were respondent's former secretary, his clients, respondent, and respondent's wife, who filled in as substitute when the regular secretary was absent. The tape of the March 6, 1970, conference was played before the master and also before us. We also have a transcript of the tape in the record. Respondent and his clients, Mr. and

Mrs. Turner, heard the tape before the master and were interrogated about it.

 The master ruled against respondent, holding that respondent had improperly applied the $480 fund to his fee. However, in a disbarment or disciplinary proceeding, the ultimate responsibility for finding the facts is ours. It is our duty to make our own decision, *In re Veach*, 365 Mo. 776, 287 S.W.2d 753, 755 (banc 1956). The findings and conclusions of a master are advisory, not binding. It is our duty to review the evidence, the credibility, weight, and value of the witnesses, and the determination of all fact issues necessary to a decision in the case are for this court, *In re Gamblin*, 458 S.W.2d 321, 323 (Mo. banc 1970). This continues to be the basis on which we hear and determine disciplinary proceedings, *In re Schiff*, 542 S.W.2d 771, 774 (Mo. banc 1976). The rule of appellate review under rule 73.01 set forth in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976) does not apply to disciplinary proceedings. Accordingly, we make our own independent review of the evidence before the master and despite our high regard for his ability and sincerity, we are unable to agree with his findings or conclusions.

 We are satisfied the tape recording is authentic and reliable, that it was made in Mr. Weiner's office on the date claimed, March 6, 1970, and that Mr. Weiner overlooked it until he ran across it when closing his office after his suspension. In the taped conversation Mr. Weiner reminded Mr. and Mrs. Turner that Mrs. Turner had called his office a month or so earlier and said to "keep the money on their fees" and return their important papers. The telephone message was jotted down by Mr. Weiner's secretary at the time and given to him by her. Respondent produced a copy of the telephone message (the original is on file in Ohio) and the secretary's carbon copy.[1] We do not believe it is a fabrication or after-

thought. Mrs. Turner did not gainsay having made the call, nor did she disagree that if she had not made such a call to the secretary, she would no doubt have objected strenuously when Mr. Weiner related the conversation. No such objection appears.

Mr. Turner remembered the March 6 conference to some extent and he knew at the time it was being taped. He could not remember authorizing his wife to make the call about applying the $480 to the fee but said it was possible he had done so.

Some of the statements made by Mr. and Mrs. Turner in the conference of March 6, 1970, are neither consistent with their complaint nor their present or past testimony against respondent; perhaps this accounts for a lack of forthrightness on their part in their testimony before the master about that conference and their reluctance to accept what the transcript and the tape itself show was said. For example, although they conceded the female voice on the tape was that of Mrs. Turner and there was no dispute about respondent's voice, neither Mr. nor Mrs. Turner would say unequivocally that the other male voice was that of Mr. Turner, despite the absurdity of the alternative that someone other than Mr. Turner could have been the third person present with Mrs. Turner and respondent in a conference dealing with personal matters involving Turner and his problems regarding child support and attorney fees.

Mr. and Mrs. Turner continued with respondent as their lawyer after the March 6 conference and they made further payments on the balance of respondent's fee. Cash payments of $20 were made on March 13 and March 20, 1970. Respondent did some work on their matters March 7, 1970, had another conference with Mrs. Turner on March 20, 1970, wrote a letter to the Bureau of Support on March 22, had further telephone conversations with Mrs.

---

1. The telephone message forms were in duplicate, bound in a pad, four to a page, with carbon paper in between, so that the making of the original also produced a duplicate carbon copy. The secretary would tear out the original and give it to Mr. Weiner and the carbon copy stayed in the pad. The carbon copy of the Terry Turner call shows the call came in at 2:50 p. m. It is in the pad in sequence along with other telephone calls before and after it on January 23, 1970.

Turner on April 1 and April 28 and a final conference with her on May 4, 1970. Mr. Turner admitted that additional payments were made on respondent's fee and that the child support matter which brought the Turners to respondent's office on March 6 had thereafter "been all straightened out". This course of events following the March 6, 1970, conference is much more consistent with respondent's position that Mrs. Turner in her telephone call of January 23, 1970, authorized him to apply the $480 to his fee than that he had no such authority or that the Turners were taking a contrary position in the March 6 meeting.

We therefore conclude that respondent did not conduct himself improperly as a member of the Missouri bar with respect to the $480 mentioned above. "In Missouri . . . disciplinary proceedings for lawyers require the charges be sustained by a preponderance of the evidence. . . ." In the *Matter of Duncan*, 541 S.W.2d 564, 569 (Mo. banc 1976). That has not been done here.

We are mindful that respondent acted promptly at the time of his suspension in Ohio to bring his suspension to the attention of the Advisory Committee of this court, as he should have done, *In re Coleman*, 492 S.W.2d 750 (Mo. banc 1973). Respondent has not practiced law here or elsewhere since his suspension in Ohio and we were informed at oral argument that his application for reinstatement in Ohio is now under consideration there.

In our judgment, no additional discipline is warranted in view of the suspension imposed by Ohio, the time that has elapsed since imposition of the suspension, and respondent's forbearance from practicing law in Missouri during the same time.

We therefore conclude this proceeding and order the costs of this proceeding assessed against informant and respondent equally.

MORGAN, BARDGETT and DONNELLY, JJ., concur.

FINCH, J., dissents in separate dissenting opinion filed.

HENLEY, J., dissents and concurs in separate dissenting opinion of FINCH, J.

RENDLEN, J., dissents and concurs in part in dissenting opinion of FINCH, J., in separate dissenting opinion filed.

FINCH, Judge, dissenting.

I respectfully dissent. I cannot concur in the conclusion reached in the principal opinion that respondent did not conduct himself improperly with respect to the $480 which had been deposited with him in trust for use for a specific purpose and that he should not be disciplined by this court.

As noted in the principal opinion, respondent was suspended for an indefinite period in Ohio on the basis that he was guilty of misconduct which violated Canon 1, DR 1–102(A)(5), Canon 2, DR 2–106(A), Canon 2, DR 2–110(A)(2) and Canon 9, DR 9–102. *Dayton Bar Association v. Weiner*, 40 Ohio St.2d 7, 69 Ohio Op.2d 83, 317 N.E.2d 783 (1974). This action was reported to our Advisory Committee, after which, on petition of the Advisory Committee, an order was entered calling upon respondent to show cause, if any, why the Ohio adjudication should not be conclusive for the purpose of discipline of respondent by this court.

After a return was filed and the case was briefed, this court, in the case of *In re Weiner*, 530 S.W.2d 222 (Mo. banc 1975), held that before arriving at a final conclusion we would appoint a master to conduct an evidentiary hearing and then make findings of fact and a recommendation as to whether this court should conclude that respondent had the permission of his client to apply on his fee the $480 which had been deposited in trust for use in settling back child support due. Pursuant to that order, we appointed Honorable David A. McMullan as master and he thereafter held two days of hearings. He filed a report in which he found that respondent improperly applied trust funds to payment of his fee and that he did not have the consent of his client to so divert and apply those funds.

I am in agreement with the holding in the principal opinion that in a disciplinary

proceeding the findings and conclusions or the master are advisory only and that the court has the obligation to review the evidence and make its own determination of fact issues. However, I strongly disagree with the conclusion therein that the evidence heard by Judge McMullan does not justify or support the findings and conclusions he reached and does not support disciplinary action. In my view, the evidence compels the findings and conclusions which the master reached.

We necessarily start with the premise that the $480 was entrusted by the Turners to respondent for a very definite and specific purpose. This was recognized in the written receipt therefor which read: "Cash in trust for back child support". Turner was involved in a dispute with the Kentucky Bureau of Support with reference to child support which he was obligated to pay to his ex-wife. They were contending that he owed back support payments amounting to about $500. Turner contended he did not owe any back support, but he wanted the matter resolved. He wanted to avoid possible incarceration and at the outset, he wanted to seek custody of the child. He consulted Weiner who already represented him in some matters. Weiner advised Turner to deposit money with him for use in working out a settlement of arrearages. Turners then borrowed $480 which they deposited with respondent on August 20, 1969, for that express purpose as the receipt shows.

There is no doubt that respondent actually used the money to pay attorneys fees to himself, a completely different purpose than that expressly stated in the receipt given when the money was deposited. That violated Canon 9, DR 9–102 unless Turner had released the money from the purpose for which it had been entrusted to Weiner and gave consent that it be withdrawn and used for the purpose for which it actually was used. The burden of so showing, thereby excusing what on the face of things appears to be a violation of respondent's duty, rests on respondent Weiner. This is not stated or recognized in the principal opinion. As I read it, its rationale for the result reached seems to be that the telephone message memo of January 23, 1970, and the tape recording of the conference on March 6, 1970, are genuine; that Mrs. Turner did, in fact, make a call on January 23, 1970, to Weiner's secretary; that Turners continued after March 6 to use Weiner as their lawyer; that they made subsequent payments on fee; that eventually the matter of child support was straightened out; and that the testimony of the Turners before the master with reference to the events in 1969 and 1970 lacked forthrightness. These, as I read the principal opinion, supply the proof that Weiner was authorized to ignore the express purpose for which the money was deposited and, instead, to apply the trust money to his fee. I simply cannot read the record and reach any such conclusion, particularly in view of some of the things which I shall proceed to discuss.

A review of the evidence heard by the master causes me to conclude that from the time the $480 was deposited in trust, respondent was determined to use that sum to guarantee payment of his fee. A conference was held in Weiner's office on September 28, 1969, approximately 5 weeks after the money for back child support had been deposited and clearly marked in trust for that purpose. In that conference, respondent informed the Turners that his bill to them for services at that time, including a few additional hours he estimated would be necessary, amounted to $800. He then took a note for that amount from them.

At that time nothing had been resolved by Weiner with the Kentucky Bureau of Support with reference to the asserted arrearages due from Turner to his ex-wife. In fact, I find nothing to indicate that Weiner had done anything with reference thereto. Even so, testified Weiner, "it was agreed upon, at that time, that I would retain the money that was sitting in trust, that Bill had given me in trust, and hold onto it until my fees were paid". In further explanation of what occurred at that September 28, 1969, meeting, respondent testified:

"Q. All right, now you say, also, on that day they agreed to something which they had not agreed to before, which is the fact that you would keep this money in trust until your fee was paid; is that correct?

"A. It was understood that I would hold onto it, yes.

"Q. In other words, while the original purpose of this trust fund was simply to pay the back arrearages, if it was determined, now it became a guarantee of your fees?

"A. I don't know if you would call it a guarantee, but I was to hold it until they paid it, yes.

"Q. And you say that took place in September?

"A. Right."

It is significant, I think, that respondent took a written note for $800 from Turners at that time, but there is nothing in writing to show the agreement allegedly made to change the terms of the trust arrangement whereby the $480 was deposited solely and exclusively for use in settling a claim for child support arrearages. Respondent didn't even write a letter after the meeting to confirm the changed arrangements with reference to the trust. It also is significant that when the Dayton Bar Association was proceeding against respondent, there was not one word from Weiner about this alleged agreement of September 28, 1969.

The transcript of testimony before the master discloses that the dispute over child payments continued without being resolved. On December 17, 1969, respondent wrote a letter to the Kentucky caseworker who was handling the matter. That letter discussed various payments allegedly made during the fall by Turner, some directly to his ex-wife, and then said: "If everything goes in accordance with our plans, we should have $500 at the end of February to pay toward any back support that might be owing."

In a postscript to Turner, which respondent added to the copy sent to Turner, he said: "As I told Terry on December 8th, I am very displeased at you that you have not followed through and made payments each week or at least the end of each month toward fees. For this reason, I am going to hold the monies that I am holding in trust and unless arrangements are made to start paying on the fees regularly, will apply that money towards them."

Respondent's explanation of this communication was that Turners in September had said they would borrow the money to pay the $800 note given for fees and that if they did that, he would have had the $480 deposited in trust to use in making payment toward the end of February as he suggested to the caseworker, but if that was not done, then, as he stated in the postscript, this money was to guarantee payment of his fee, this having been agreed upon at the September meeting. If that explanation is valid, it is hard to understand why *no reference was made to a September 28, 1969, agreement.*

At the hearing before the master, respondent offered in evidence a telephone message memo dated January 23, 1970, which indicated a call from Mrs. Turner taken by Weiner's secretary. The words used in the memo to describe the message were "wants all their important papers and just keep the money on their fee". Weiner's former secretary identified the message as having been written by her. She had no independent recollection of the conversation, and, hence, could give no further details.

Based on that telephone memo, Weiner immediately applied the $480 in child support money to payment of his fee for services. An entry dated 1/23/70 in Weiner's handwriting on the ledger card showing fees due from Turners, shows a credit of $480 as follows: "From trust, four hundred and eighty dollars ($480.00)."[1] Although Weiner had not talked to Mrs. Turner (or to

---

1. Although respondent applied the $480 to his fee on January 23, 1970, he did not return Turners' papers as the telephone memo indicated he was to do. In the later conference on March 6, 1970, respondent told the Turners he would not return their papers until he was paid in full.

Turner) and had only the memo from his secretary, he did not then write a letter to the Turners to confirm the telephone call and to say that pursuant thereto, he had applied the $480 on his unpaid fees. He had nothing in writing from the Turners authorizing a change in the terms of the trust arrangement and he did not even write to them to state what he had done on the basis of his understanding that Mrs. Turner had authorized this action.

Weiner relies heavily on a tape of a conference held with the Turners in his office on March 6, 1970. It is his contention that this confirms the fact that Mrs. Turner, by a phone call to his secretary on January 23, 1970, authorized application of the $480 on fees. The Turners had come on March 6 to see Weiner because the Kentucky authorities were after him again and were threatening to put him in jail. Turner kept asking Weiner to release the $480 for application on support payments but Weiner said repeatedly, "I'm not going to release any money," adding, "I can't believe they would put him in jail for $480.00."

I cannot conclude that Mrs. Turner confirmed at that March 6, 1970, conference that she had authorized Weiner's secretary on January 23, 1970, to apply the $480 on fees. The recording is very hard to understand. Fortunately, we were furnished a transcript thereof prepared by a court reporter. I find two brief references therein which make reference to Mrs. Turner's call on January 23, 1970. The first is as follows:

"MR. WEINER: I'm not going to release any money. Terry called up here—first off, I told her a long time ago since you guys broke every bit of promises you made, that I was going to apply it toward fees. Terry called up here like a month or six weeks ago or two months, and told Marg to put it on fees, and she wanted your file, she said, 'Figure up all my time,' I did, I pulled the cotton pickin' file and that's why the card is in the file. And I dictated a detailed breakdown on what I figured it up for you.

"TERRY TURNER: I told you when I went to work I would start bringing you in some money.

"MR. WEINER: Then you—yes, she told me she was going to go to work like six weeks ago.

"TERRY TURNER: I have went to work.

"MR. WEINER: But I haven't seen any money.

"TERRY TURNER: I haven't drawed a check either."

In that exchange, Mrs. Turner did not confirm that she had authorized application of the trust money on fees. Instead, she indicated that she had said she would start working and would bring in some money.

The other reference to the January 23, 1970, telephone conversation was as follows:

"MR. WEINER: Six weeks ago when you called, you know, you gave Marg the message and this is exactly what we did, we put that money towards fees. And I took you at your word, which is when you started drawing a check you would bring in, you know, money each week. Isn't that what you told me, right?

"TERRY TURNER: Yeah.

"MR. WEINER: O.K. Now, I haven't bugged you since then because I—the same thing I didn't bug you as we proceeded along. I liked you, felt sorry for you, I knocked my brains out for you."

In his first statement, Weiner refers to the phone call and application to fees and then he says: "And I took you at your word, which is when you started drawing a check you bring in, you know, money each week. Isn't that what you told me, right?" Mrs. Turner then responded "Yeah". I think it is clear that the statement was in response to Weiner's direct question to her about what she would do when she started to work. It is not a confirmation that she had told Marge, the secretary, to apply the $480 on fees. Counsel for Weiner in the hearing before the master acknowledged, as the master's report shows, that this response by Mrs. Turner was ambiguous.

As a matter of fact, the purpose of the visit and conference, which was to get Weiner to release the $480 to the Kentucky authorities and avoid the possibility of Turner being jailed, is consistent with the proposition that the money was still being held in trust for that purpose and had not already been disbursed. This is confirmed by this statement by Turner to Weiner in that conference:

"BILL TURNER: If you can go down there and get this straightened out where I can make payments on the back child support, you keep the $530.00 or $510.00, and I'll bring you—I'll give you $40.00 today and every week that I get paid, which she doesn't get paid, I'll bring you $20.00. And the week she gets paid, I get bring, we will pay you $40.00.

"MR. WEINER: All right." [2]

In commenting on this taped conference, the master in his report to this court states:

" * * * One must keep in mind that at the time of the taped conversation, i. e. March 6, 1970, the $480 had already been transferred to the fee account and also that the purpose for which it was deposited had not been accomplished. Mr. Turner was in trouble for not making the payment for child support and he and his wife had requested Mr. Weiner to 'release the money I got . . .' Mr. Turner stated they would put him in jail if Mr. Weiner didn't release the money. Mr. Weiner told them at the outset of the conversation that, 'I am not going to release the money.' (Exhibit 8, page 2) Mr. Turner finally told Mr. Weiner that, 'if he could get this straightened out where I can make payments on the back child support, you keep the money (that was turned over to Weiner).' At that time the arrearage was over $1,000.

"No reasonable interpretation of the taped conversation shows that Mr. Turner authorized and consented on that occasion to the use of the funds for a fee. Mr. Turner had been jailed for failure to pay support money (Ohio T, page 452) and it is obvious he was afraid of being placed back in jail. He was desperately trying to make the best of a bad situation when he told Respondent 'If you can go down there (Kentucky) and get this straightened out where I can make payments on the child support, you keep the $530 or $570 [sic] and I will bring you $40 today and every week.' (Exhibit 8, page 9) It appears to be true that Mr. Weiner did at a later date work out an agreement (3–19 T, page 53) wherein Mr. Turner was to pay $10 per week over the child support allowance which could be applied to the arrearage, but this does not change in any way whatsoever the misapplication of the $480 trust fund.

"The Turners in their testimony at the hearing on April 24, 1976, were unsure of many things and had difficulty recollecting. This, of course, is natural considering a lapse of time of six years or more since the events occurred. However, Mrs. Turner continued to insist that in her conversation with Mr. Weiner's secretary she told her that if Mr. Weiner used the money for fees, she would personally see what could be done about it. (4–24 T, pages 42–44)

"Again referring to the taped conversation, it was Mr. Weiner who stated to the Turners that Terry Turner had told his secretary to apply the trust fund to fees. Terry Turner was interrogated about this and she pointed out, and counsel for Respondent agreed, that the result is very ambiguous. (4–24 T, page 45) Again Respondent fails to prove consent."

The transcript in this case indicates that from the very time the $480 was deposited in trust, Weiner had an obsession about payment of his fees. Prior to August 20, 1969, respondent had directed Turner to bring in $500 for his retainer fee plus $500 to be held in trust until arrearages could be determined or settled. The Turners borrowed the $480 for purposes of settling back child support charges but brought in no money for the requested retainer. From

---

2. The reference to $530 or $510 was to the $480, plus some other amounts left with Weiner which were in dispute and which perhaps were used for fees or some other purpose.

that time on, Weiner kept after Turners to pay his fee. By September 28, 1969, he had determined on a bill for $800, for which he took a note. His whole attitude and philosophy appears in some answers he gave in response to questions by counsel for the Advisory Committee and by the master. At page 109 of the transcript, respondent was asked this question: "If, after the agreement which you alleged happened, occurred in September of 1969, it had been determined that your client owed five hundred dollars ($500.00) in back child support, would you have applied that four hundred and eighty dollars ($480.00) in trust to that back child support or would you have not done so?" For several pages respondent sparred and evaded, making such responses as the question was purely hypothetical, there was still a dispute as to whether there was any arrearage, etc. He finally conceded that "once an arrearage would be determined, there would be a need to have some money available if we were going to negotiate it, yes." However, he would not and did not say that if such were determined, this trust money would have been available for that purpose. Judge McMullan pressed respondent with numerous questions seeking an answer to the question of what, after September 28, 1969, the trust money would have been used for, if, say in October, it was determined that there was arrearage of $500. Finally, at p. 123 of the transcript, he stated this question to Weiner. "Well, I'm going to ask you a simple question, which had priority after September, of the trust fund; any claim for arrearage or your fee? Weiner responded thus: "All right; based on the agreement, at that time, if they had never paid my fees, the priority was that the money would be utilized toward my fees, rather than using it for negotiating on any arrearage that might become due."

That, I submit, tells the story. To me, it is apparent that at least from and after September 28, 1969, Weiner had no intention of utilizing the $480 for delinquent child support payments unless meanwhile the Turners had paid his fee. His testimony before the master and the postscript to

the letter of December 17, 1969, so show. The evidence indicates, to me, that Weiner really made no real effort to ascertain the amount of an arrearage and to resolve that question until after the $480 had been applied to his fee.

I find it inconceivable that on this record we should hold that Missouri should not discipline respondent in any way, in effect saying to respondent that you are free tomorrow to come to Missouri and start practicing, regardless of whether Ohio does or does not sustain your motion for reinstatement.

I would hold, as did the master, that Weiner has not proved that he was given authority to divert the trust funds to paying himself and that the evidence discloses that Weiner did violate the applicable canon and disciplinary rule with reference to handling these trust funds.

I would suspend respondent indefinitely, with leave to apply for reinstatement after two years.