In the Matter of George H.
MILLER, Respondent.

No. 60136.

Supreme Court of Missouri,
En Banc.

March 13, 1978.

Larry M. Woods, Columbia, for informant.

Thomas D. Cochran, Joe F. Willerth, Piedimonte & Cochran, Independence, Robert L. Wesner, Sedalia, for respondent.

PER CURIAM:

Harold W. Barrick, General Chairman of the Advisory Committee of the Missouri Bar Administration, filed an information in this Court charging George H. Miller, an attorney, with four counts of professional misconduct, and requested a hearing and a judgment of disbarment.

In response an answer was filed admitting the allegations of Counts I and II, pleading mitigating and extenuating circumstances, and denying the allegations of Counts III and IV.

Honorable Paul E. Carver, appointed Special Master, conducted a full hearing, and in due course filed a 27-page "Statement, Finding of Fact, Declaration of Law and Advisory Recommendation," concluding with a recommendation that respondent be found not guilty on all four counts for failure to prove the charges by a preponderance of the evidence, and discharged from all disciplinary actions. Briefs were filed and the matter was argued before the full Court.

■ In a disciplinary proceeding the findings and conclusions of a special master are advisory only, and not binding. This Court has the obligation of reviewing the evidence, making its own determination of fact issues, declaring the law, and finally determining the matter. *In re Weiner*, 547 S.W.2d 459 (Mo. banc 1977). With all due respect for the honorable and experienced special master, we are obliged to disagree with his ultimate conclusions and recommendations.

Essential background facts: Respondent was admitted to the bar in 1936. He and William H. Morris, members of the same church, were friends of long standing. Respondent was the confidant of Mr. Morris, who had implicit confidence in respondent's honesty, integrity and competence as lawyer and adviser. Mr. Morris accumulated some town property, a small farm, a $5,000

bond, mortgages and savings accounts. Early in life he and his wife took into their home and raised an orphan boy aged 3 or 4 years, who was given the name Jack Morris. Jack was never legally adopted by the Morrises. In 1966 William H. Morris suffered a stroke, after which he was physically incapacitated and bedfast until his death. On June 16, 1966, while still mentally competent, Mr. Morris executed a general power of attorney to respondent, who assumed management and control of his properties. Mr. Morris deteriorated mentally, and was not mentally competent from and after 1968 or 1969. He died intestate on December 10, 1974. Jack Morris was appointed administrator of his estate. In a separate proceeding in circuit court the equitable adoption of Jack Morris by William H. Morris was judicially decreed following Mr. Morris' death. The attorney for the administrator called upon respondent to make an accounting of his stewardship. Respondent responded by producing all his records, checks, settlements year by year, and other data, from 1966 to 1974, and by writing comprehensive and detailed letters of explanation. All the data respecting the transactions and movement of funds which provided the basis for the charges made in these disciplinary proceedings was first disclosed in respondent's correspondence and accounting, and not "dug out as a result of some investigation or some exploration of what transpired." Several discrepancies discovered by the attorney for the administrator were explained to the latter's satisfaction, or made good by respondent, who paid into the estate all sums due and as required by the administrator and his attorney, with interest, without contesting their demands or haggling over amounts, with one exception, of which more later. Jack

Morris, the equitably adopted son and sole heir of William H. Morris, acknowledged on the stand that he had realized a full recovery of everything to which he was entitled, stating, "Yes, I got everything." The attorney for the administrator testified that every item or asset due the estate was accounted for and paid by respondent.

## COUNTS I AND II

Count I alleged that beginning in the year 1968 respondent, acting under a power of attorney executed by William H. Morris on June 16, 1966, did use the funds of William H. Morris as a source of credit for his personal farming operation, withdrawing sums for said purpose from 1968 through 1974 in various amounts totalling approximately $30,000, contrary to the provisions of Disciplinary Rule 1–102(A)(4),[1] (5)[2] and (6),[3] and DR 5–104(A)[4] of Rule 4, Supreme Court of Missouri.

Count II alleged that acting under the power of attorney respondent contracted with his wife for the sale of property on behalf of his client, contrary to these disciplinary rules.

At the outset of the hearing before the special master respondent's counsel stated that the circumstances alleged had never been and were not then denied; that respondent was not of the opinion that his actions were proper or right; that respondent had "technically" admitted the charges in Counts I and II from the beginning, and made no attempt to cover up; that the first instance in which the circumstances giving rise to these charges came to light was a letter dated February 25, 1975, written by respondent to the attorney for the administrator, outlining the very facts upon which

1. "A lawyer shall not * * * [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

2. "A lawyer shall not * * * [e]ngage in conduct that is prejudicial to the administration of justice."

3. "A lawyer shall not * * * [e]ngage in any other conduct that adversely reflects on his fitness to practice law."

4. "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

Counts I and II were based; that respondent's borrowings from Mr. Morris' assets were made without criminal intent or intent to do any moral wrong, and without subterfuge or involvement of third parties; that the borrowings were evidenced by promptly executed promissory notes, which respondent intended to and did repay in full to the estate; that the estate suffered no financial loss; that while there was a technical ethical violation, there was at most negligence or "something that might have approached malpractice." Respondent conceded the principal facts upon which the charges in Counts I and II were founded; that he had made errors of judgment; that in handling this matter, if he had it to do over again there were many things he would not have done in the way they were done, or would not have done at all, but claimed his actions were not acts of dishonesty. Respondent's brief, and his counsel in oral argument, admitted the basic facts alleged in Counts I and II and admitted errors of judgment but pleaded that respondent's use of his client's funds for his own uses and purposes was done with full disclosure either to William H. Morris or Jack Morris, and with a full accounting for all funds, with compound interest on amounts due, and that respondent's conduct did not involve dishonesty, fraud, deceit or misrepresentation.

From the admissions, pleadings, the opening statement of respondent's counsel, respondent's admissions on the witness stand and in his brief, and the undisputed oral and documentary evidence, we find that respondent appropriated, treated as his own and availed himself of the personal use of a total of approximately $30,000 of William H. Morris' funds entrusted to him for safekeeping, management and investment, and that respondent made arrangements for respondent's wife to take title to real estate in which Mr. Morris had a security interest, in the course of which an unsecured promissory note was substituted for a note secured by a recorded deed of trust.

Respondent had no authority, actual or implied, to appropriate his client's funds for his own personal purposes, and in so doing violated elementary rules of fiduciary obligation. The power of attorney to "transact [any] and all business in any way connected with any and all property or property rights [he possessed] whether real or personal property" gave him no such authority. The donee of such a power may not engage in self-aggrandizement. None of the borrowings—not even the first one, in 1968—was made with the consent of William H. Morris. Subsequent borrowings could not have been made with his consent, for he was concededly mentally incapacitated after 1968 or 1969. It is no justification that Jack Morris consented to respondent's borrowing these funds. Jack Morris' consent did not constitute consent of the client after full disclosure, within the meaning of DR 5–104(A), Rule 4, because Jack Morris had no right to give or withhold consent for William H. Morris. Although William H. Morris' account, from which some of these loans were taken, was in the joint names of William H. Morris and Jack Morris, the inclusion of Jack's name was a mere formality, to enable Jack to obtain the funds at Mr. Morris' death and not to give Jack a present interest (a fact conceded by Jack). The mechanics of the first appropriation, in 1968, were as follows: Desiring to borrow $5,000 from his client's funds respondent wrote Jack Morris a check for $5,000, drawn on the joint account, and in return had Jack issue a check to respondent for $5,000, drawn on Jack's private bank account. Questioned as to why he adopted this strange procedure respondent's explanation was that this would show that Jack knew what respondent was doing with Mr. Morris' money—knew that respondent was borrowing funds of William H. Morris. Unexplained is the fact that respondent did not follow this procedure thereafter. Subsequent borrowings were made by check made out and signed by "William H. Morris, by George H. Miller, Power of Attorney," payable to respondent or respondent's wife, who contemporaneously executed unsecured promissory notes payable to William H. Morris. Asked why he had his wife appear as the borrower in several transactions,

when he showed on his settlements that they were loans to him, respondent answered "as a matter of convenience" (while at the same time agreeing that it would have been just as convenient to show that *he* was the borrower). For an attorney thus to impose upon the confidence reposed in him by his client is "dishonest by any standard, lay or professional," and such acts "establish unprofessional conduct beyond all question." *In re Kohlmeyer*, 327 S.W.2d 249, 251 (Mo. banc 1959). "An attorney who misappropriates the funds of his client * * by appropriating to his own use funds intrusted to his care, is guilty of conduct which cannot be tolerated." *In re Block*, 136 S.W.2d 358, 362 (Mo.App.1940). Under no circumstances should he use such funds for his own purposes, without his client's knowledge and consent, 7 C.J.S. Attorney and Client § 139, which, in view of Mr. Morris' mental incapacity, could not have been obtained, thus foreclosing any such possibility. Where a client is mentally incapacitated the lawyer's appropriation of the client's funds becomes all the more reprehensible.

None of the following reasons suggested by respondent excuse his misconduct: that he always provided for a higher rate of interest in the promissory notes he signed than could be obtained by investing the funds in savings accounts of financial institutions; that he intended to repay the loans and was financially able to do so; that his motives and intent were good; that the transactions were made known to Jack Morris (although concededly Jack Morris was not kin to William H. Morris by blood, and had not at that time been adopted); that the transactions occurred without any attempt at concealment.

* * * * * *

Respondent improperly dealt with respondent's wife in connection with her acquisition of a security interest of William H. Morris in certain real estate. The transaction, resulting in her obtaining title to real estate in which respondent's mentally incapacitated client had a security interest, gives every appearance of impropriety. Respondent testified, "In retrospect, I shouldn't have sold it to her at all."

The property, owned by William H. Morris, was sold by him to a couple named Schlesselman, in 1964, before the onset of his infirmities. The Schlesselmans gave Mr. Morris a first deed of trust on the property. They were slow pay. They defaulted on their obligation, but Mr. Morris, during the time he was attending to his own affairs, and respondent, after the latter took over management of Mr. Morris' affairs, indulged the Schlesselmans for years. Finally in 1972, after the Schlesselmans had despoiled the property, rendered it unfit for human habitation, and finally abandoned it, the Schlesselmans, far in arrears on their payments, to avoid foreclosure, were prevailed upon by respondent to execute a deed to the property with the name of the grantee left blank, with a clause in the deed providing that grantee assumed and agreed to pay the balance due on the note and pay back taxes on the property. A real estate agent estimated that if the house were cleaned up, made habitable and the sewer unstopped, it could be sold for $2,500. The deed in blank, dated December 12, 1972, was acknowledged January 27, 1973. Respondent had one of his farm employees clean the house and haul away loads of debris, and paid him $130 from Mr. Morris' account, in February, 1973. Respondent sold the property to his wife, who wanted to rehabilitate the property. Respondent had his wife's name filled in as grantee in the deed, and promised his wife that the property would be cleaned up, the sewer unstopped, etc. at the expense of Mr. Morris. His wife paid for the property by executing an unsecured promissory note to William H. Morris for $2,500, dated March 1, 1973. The deed naming respondent's wife as grantee was recorded in July, 1973, at which time the Schlesselman deed of trust was released of record. In June, 1973 respondent paid his farm employee $60 for lawn care, from Mr. Morris' assets. Respondent's wife did not make any interest or principal payments on the $2,500 note prior to Mr. Morris' death. After the administrator began to liquidate

cation of these transactions at the times mentioned.

Having provided in the deed that the grantee assumed and agreed to pay the back taxes, respondent acted improperly in spending Mr. Morris' funds for that purpose. Having sold the property to his wife on March 1, 1973, respondent had no right to spend Mr. Morris' funds for yard work on the property, which from and after March 1 was her responsibility. In both instances, respondent violated the disciplinary rule [4] proscribing business transactions involving a client when the attorney has conflicting interests.

### COUNT IV

■ Count IV charged that acting under the power of attorney respondent "fail[ed] to keep the funds of his client properly identified as to record ownership, sometimes depositing funds owned by his client individually in accounts owned jointly with another, or withdrawing funds from accounts owned jointly with another for other uses," contrary to DR 1–102(A)(4), (5) and (6), and DR 9–102(B)(2),[5] Rule 4, supra.

There is no evidence that respondent commingled the funds of William H. Morris with those of respondent. They were kept in separate accounts in different banks.

Although respondent deposited funds belonging to William H. Morris in an account in the joint names of William H. Morris and Jack Morris, we find no fault with this. William H. Morris established this joint account while in charge of his own affairs, and he desired the bulk of his property to finally go to Jack Morris. Respondent did not handle the joint account in such a way as to enable Jack Morris to obtain any funds therefrom to the exclusion and prejudice of William H. Morris during the latter's lifetime. To this extent respondent is vindicated on Count IV.

■ There are, however, facts upon the basis of which respondent must be held to have violated DR 9–102(B)(2), supra.

There is no evidence that respondent rented a safe deposit box for the safekeeping of the securities of William H. Morris, as contemplated by DR 9–102(B)(2). If he did, he did not keep the securities in the box.

Respondent negligently misplaced the $2,500 note dated March 1, 1973, executed by his wife. Strangely, when called upon by the attorney for the administrator to produce it, respondent prepared and had his wife sign another note for $2,500, dated back to December 12, 1974, which he delivered to the attorney for the administrator *without telling him of the substitution.* The later note named William H. Morris and Jack Morris as payees, although William H. Morris was dead at the time the note was dated. The note constituted a promise to pay $2,500 on or before December 1, 1975, but it was dated December 12, 1974 (nearly a year after due date). When this discrepancy was called to his attention respondent admitted what he had done. Respondent characterized this as one of his "stupid mistakes." The original note, later found, was eventually paid by respondent, with interest, as previously mentioned, and therefore the estate sustained no loss. That fact, however, does not excuse respondent's improper and deceitful conduct, involving an unbecoming misrepresentation unbefitting a licensed lawyer.

Demonstrating respondent's failure to comply with the spirit as well as the letter of DR 9–102(B)(2), respondent lost a $5,000 American Telephone & Telegraph Company bond belonging to William H. Morris. Respondent claims credit for having paid the expense of procuring a duplicate bond, which amounted to $150, and argues that the estate did not suffer by reason of his losing the original bond, but these facts do not blot out his violation of the disciplinary rule.

Another failure to properly "identify" and keep safe the funds of respondent's

**5.** "A lawyer shall: * * * Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable."

the estate respondent paid his wife's note, with interest, in the sum of $2,948.

■ The deed from the Schlesselmans, naming respondent's wife as grantee, is to be treated as if it had been a conveyance procured by respondent from William H. Morris to respondent. A conveyance from a client to an attorney is presumptively fraudulent, and the burden is on the attorney to prove by convincing evidence that the transaction and the conveyance itself was fair and equitable in every respect. *Laspy v. Anderson*, 361 S.W.2d 680 (Mo. 1962). Full disclosure to the client of all pertinent information and advice (the same as if the client were dealing with a stranger) is essential. Of course no such disclosure or advice was possible in this case—no permission could be obtained from the client—because of his mental incapacity . . . all the more reason to exercise care in guarding his client's interests. Before the transaction William H. Morris had a recorded deed of trust on the property. After the transaction he had no deed of trust. By reason of respondent's taking an unsecured promissory note from his wife in payment for the property Mr. Morris' security was impaired.

Both in connection with respondent's appropriation of his client's funds for his own personal use (Count I) and his arranging for his wife to acquire real estate in a transaction by which his incapacitated client was divested of a security interest (Count II) respondent was guilty of conduct involving an inherent conflict of his interests with those of his client, in violation of his trust, and contrary to DR 5–104(A), supra. Such conduct, inexcusably indiscreet and inherently dishonest, reflected adversely upon respondent's fitness to practice law, and was prejudicial to the administration of justice, in violation of DR 1–102(A)(5) and (6) of Rule 4. Respondent's payment of his wife's notes, and his repayment of his personal borrowings, do not operate to relieve him of the charges. *State Bar Committee v. Stumbaugh*, 123 S.W.2d 51 (Mo.1938); *In re Conner*, 357 Mo. 270, 207 S.W.2d 492 (banc 1948).

## COUNT III

■ Count III alleged that acting under the power of attorney respondent expended funds of his client to the benefit of his wife by paying taxes and cleanup costs on the property respondent sold to her, and by lending his client's funds to his wife, contrary to the disciplinary rules previously mentioned.

That respondent loaned funds of William H. Morris to respondent's wife is documented by originals or photostatic copies of five cancelled checks, drawn upon the bank account of William H. Morris, signed by respondent under his power of attorney, payable to Georgia Miller, totalling $12,000, dated from July, 1970 to August, 1974. Respondent had no authority to lend his client's funds to respondent's wife. The loans should be treated as borrowings by respondent from the client's funds, making applicable the law pertaining to an unauthorized appropriation by an attorney of his client's funds. *Laspy v. Anderson*, supra.

As to back taxes and cleanup costs: On February 26, 1973 respondent paid back taxes to Pettis County in the sum of $265.88 and on August 30, 1974 paid back taxes on this property to the city collector in the sum of $265.91, out of Mr. Morris' assets. When the attorney for the administrator made claim upon respondent for repayment of these amounts, respondent demurred on the ground that Mr. Morris would not have wanted the property to be offered for sale without payment of back taxes and having it in proper condition. It was not until after the attorney for the administrator informed respondent that he had prepared a petition ready to file in court to recover these items that respondent paid them, with interest.

The special master found respondent not guilty of the charges in Count III on the ground that William H. Morris knew of, approved and ratified these transactions. The difficulty with this finding is that everyone concedes that William H. Morris was not mentally competent after 1968 or 1969, and consequently he was incapable of ratifi-

principal occurred in respect to a $5,000 payment due Mr. Morris by one Eva Wehrman. Respondent sold her a residence property belonging to Mr. Morris for the agreed price of $10,500. She borrowed $5,500 from a local institution and paid it to respondent, leaving $5,000 due and unpaid. Years later, when called upon to account for the remaining $5,000, respondent could not remember what happened in this connection. His records did not show, and intensive investigation did not reveal, whether, when, or if the purchaser ever paid the balance of $5,000 to respondent. Respondent claims he did not know until Mr. Morris died that he had not collected the full $10,500 from Eva Wehrman. Admitting he "neglected" to collect the $5,000 from her, respondent assumed responsibility for and paid the $5,000 into the estate, with interest.

Another incident involved respondent's failure to file a security agreement on time. Anderson, a tenant of respondent on one of respondent's farms, wanted to borrow $6,500 with which to purchase a tractor. Respondent loaned him $6,500 from funds of William H. Morris, taking an unsecured note to evidence the debt. Later respondent had Anderson execute a new combination note and security agreement in favor of Mr. Morris. In the meantime, Anderson, without informing respondent of his intention to do so, secured another loan on the tractor from a third party and gave the third party a security instrument on the tractor, which was filed for record before respondent presented Mr. Morris' security agreement for filing. Anderson then defaulted on the $6,500 note due Mr. Morris. Respondent assumed responsibility for the loss sustained by Anderson's defalcation and reimbursed the estate for the loss with interest but, again, respondent's repair of the damage done does not excuse his violation of the disciplinary rule.

Finally, respondent was unable to make an exact accounting of his stewardship of Mr. Morris' affairs for the year 1966, because he either lost, misplaced or inadvertently destroyed his file for that year, including all check stubs and checks.

For these reasons we find that respondent violated DR 9–102(B)(2) as charged in Count IV.

## Conclusion

Rule 5.18 provides that if this Court finds that charges of disciplinary infractions are true, "the Court shall render a judgment finding Respondent guilty and shall reprimand the Respondent or suspend him from practice for an indefinite period or a time fixed in the discretion of the Court or disbar him, as shall to the Court seem proper."

▉▉▉ Respondent, now 70 years of age, has for years borne an excellent professional reputation among his colleagues, outstanding lawyers and respected judges, for honesty, integrity, good character and professional competence as a lawyer. From 1936 to 1948 respondent served the public as a state senator. Twice he received the nomination of his political party for statewide offices (Lieutenant-Governor and Attorney-General). While these facts constitute no defense in this type of proceeding the Court may consider them in determining what action should be taken under the circumstances. *In re Landon*, 319 S.W.2d 553, 558[2] (Mo. banc 1959). In spite of his unimpeached public and professional life prior to 1966 respondent, who stood in the relationship and acted in the capacity of a fiduciary in handling the affairs, funds and property of William H. Morris, demonstrated a lamentable failure to properly appreciate the duties and responsibilities of a fiduciary and an insensitivity to the limitations and restrictions imposed upon him by virtue of that relationship. At the disciplinary hearing respondent disclaimed the existence of a fiduciary relationship, calling it instead doing the best thing he could for Mr. Morris as "a lay matter" in the handling of his money "from the standpoint of friendship." Respondent took the position that at the time he honestly thought he was doing Mr. Morris a favor by borrowing his funds and agreeing to pay interest in excess of that obtainable by investing the funds in savings accounts in financial institutions. Although

now respondent expresses regret for his actions and is contrite, he still maintains that he is guilty of no more than negligence or mere technical violation of ethics, since his motives and intentions were good; that the sale of the real estate to his wife was "in the best interests of William Morris"; that his handling of the funds was not prejudicial to Mr. Morris' interests and "not in violation of the disciplinary rules." He emphasizes that his use of the funds was fully disclosed, and contends that having paid all the notes he and his wife signed; having restored to the estate all monies lost by his mistakes, and having satisfied all claims arising out of discovered discrepancies in his accounting, he should be discharged without any disciplinary action, except perhaps a private reprimand.

This Court has uniformly held that misconduct of attorneys in appropriating to their own use funds entrusted to their care and held in a fiduciary capacity justifies disbarment. *In re Conner*, supra. In most cases where disbarment has been ordered on this ground there was a contumacious failure or refusal of the erring lawyer to properly account for or pay over the funds entrusted to him, *In re Conner*, supra, and in some instances the lawyer's conduct amounted to embezzlement. *State Bar Committee v. Stumbaugh*, supra. Respondent's conduct was not contumacious. With one minor exception, respondent freely and willingly cooperated in his accounting and restoration of all sums claimed by administrator and attorney to be due the estate, even to the point of agreeing to pay compound interest. His accountings and payments (with the exception of the claims for back taxes and yard work) were not made under threat of prosecution, litigation or complaint to the advisory committee of the bar. He borrowed from Mr. Morris' accounts openly, with no effort at concealment. He apparently thought he was acting for Mr. Morris' benefit. Respondent did not intend to permanently deprive Mr. Morris of the use of these funds. He fully intended to repay, and did repay them. He is not guilty of conduct involving moral turpitude or conscious wrongdoing. For these reasons permanent disbarment is not justified in order to attain the ultimate objectives of Rule 4, the Code of Professional Responsibility, the primary purpose of which is to protect the public and those charged with the administration of justice, *In re Kirtz*, 494 S.W.2d 324, 326[1] (Mo. banc 1973), and promote public confidence in the integrity and efficiency of the legal system and the legal profession.

██ Indefinite suspension from the practice of law, with leave to apply for reinstatement after a stated period, has been ordered in several cases, for example, *In re Houtchens*, 555 S.W.2d 24 (Mo. banc 1977), but that solution does not fit this case, in which no general unfitness to practice law is shown.

On the other hand, this Court would not properly discharge its obligation to the public, the profession and the courts by merely administering a private reprimand, in this case, with its serious implications.

Rule 5.25 provides that "Nothing in Rule 5 shall be construed as a limitation upon the powers of this Court to govern the conduct of its officers * * * [N]or shall this Rule constitute an exclusive method for regulating the practice of law." These provisions implement the inherent power of this Court to tailor and shape its judgment to fit the nature, character, gravity and effect of professional misconduct, and bespeak the flexibility in rendering judgment necessary to attain the objectives of Rule 4. Pursuant thereto this Court has used the device of probation in connection with a public reprimand, with a reservation of jurisdiction for further consideration of the possibility of more severe disciplinary action, when that was deemed appropriate. *In re Schiff*, 542 S.W.2d 771 (Mo. banc 1976).

Respondent's violations of the disciplinary rules relate solely to his derelictions as a fiduciary. The appropriate order in this case, in order to protect the public and the other interests involved, is to publicly reprimand respondent and issue the following directives:

1. That within 15 days after the filing of this opinion respondent file with the Chairman of the Advisory Committee of the Missouri Bar Administration a complete written list of all cases, proceedings, estates, guardianships, trusts, funds or matters in which as administrator, agent, executor, guardian, trustee, attorney, attorney-in-fact, or in other fiduciary capacity, respondent now has in his possession, dominion and control funds and/or property belonging to other persons, firms or corporations, and that he file a copy of said list with the clerk of this Court.

2. That respondent proceed with speed and dispatch to resign, withdraw from and relinquish every such office or responsibility as soon as may be done consistent with orderly procedure and safety to the beneficiaries, and make final settlements and accountings of his stewardship.

3. That for a period of 2 years after the filing of this opinion respondent not accept any office, appointment, employment or assignment of a fiduciary nature involving the continuing supervision and control over funds, accounts in financial institutions, securities, or real or personal property of others.

4. That the chairman of the said advisory committee be, and he is hereby, authorized to supervise the expeditious execution of these directives.

5. That at the end of the 2-year period respondent file a report of his doings with the clerk of this Court.

We reserve jurisdiction to reconsider suspension upon our own motion, or that of the Advisory Committee of the Missouri Bar Administration, at any time in the course of the execution of these directives.

In his report Hon. Paul E. Carver requested that he be allowed no compensation for his services, stating that he will refuse any award allowed. We therefore simply express our appreciation for his help and assistance in this matter. His claim for actual out-of-pocket expenses, however, and the fees of reporters, secretary, and sheriff, listed on page 27 of the special master's report, are hereby allowed, and these items, together with all costs incurred in this Court, are ordered to be paid by respondent.

MORGAN, C. J., and BARDGETT, DONNELLY, RENDLEN and SEILER, JJ., ALDEN A. STOCKARD and NORWIN D. HOUSER, Special Judges, concur.

HENLEY and FINCH, JJ., not sitting.