**In the Matter of Gerald H. LOWTHER.**

**No. 60716.**

Supreme Court of Missouri,
En Banc.

Jan. 13, 1981.

Rehearing Denied Feb. 9, 1981.

Byron J. Beck, John W. Cowden, Kansas City, for informants.

Ransom A. Ellis, Jr., Springfield, for respondent.

**PER CURIAM.**

This is an original disciplinary proceeding instituted by the Advisory Committee of The Missouri Bar against respondent. The Advisory Committee found probable cause that respondent was guilty of professional misconduct and filed an information in three counts in this Court. After answer, we appointed Hon. David A. McMullan, a retired circuit judge, as special master. During the hearing before Judge McMullan the third count of the information was withdrawn with prejudice. After the hearing, the special master filed his findings of fact and conclusions of law in which he found respondent guilty of professional misconduct on both counts and recommended that respondent's license be suspended for a period of one year.

There has been an enormous amount of work put into his case by the Advisory Committee, its attorneys, the attorneys for respondent, and our special master. The hearing before Judge McMullan lasted for six days. The transcript contains over 1300 pages. There are over 150 exhibits. As Judge McMullan says in his report, "It is an example of the concern the members of the legal profession have for maintaining high professional ethics and, at the same time, the great value they place upon the privilege to practice law and the necessity for protecting that privilege."

Count I alleges that in December 1968, respondent used his position as an attorney for Founders of American Investment Corporation to obtain one-fifth of 2% of certain mining interests as a condition precedent to the corporation's guaranteeing certain loans. The primary basis for the charge is that respondent drafted and prepared for his clients an agreement containing paragraph 8[1] and that respondent had a monetary interest in the agreement.

Count II alleges that between 1972 and 1974, respondent, a partner in the law firm

---

1. 8. In consideration of the payment of Ten Dollars ($10.00) and other valuable considerations, the receipt and sufficiency whereof is hereby acknowledged, and as consideration for Founders of American Investment Corporation signing said notes not to exceed an aggregate sum of Two Hundred Thousand Dollars ($200,-000.00), it is agreed that E. M. Riebold and

of Miller, Fairman, Sanford, Carr and Lowther, deposited to his own account increases in retainers paid by two corporate clients of the firm.

■ In disciplinary proceedings such as this, guilt must be established by a preponderance of the evidence. *In re Weiner,* 547 S.W.2d 459, 561 (Mo. banc 1977); *Matter of Duncan,* 541 S.W.2d 564, 569 (Mo. banc 1976).

I

The matter before the Court illustrates the inherent danger of becoming personally involved with the affairs of clients, self dealing with clients, and of "taking a piece of the action". The attorney, with his superior knowledge and education, can pursue this course only at his peril. It is an area wrought with pitfalls and traps and the Court is without choice other than to hold the attorney to the highest of standards under such circumstances.

■ The findings of the special master and his recommendations are set forth in full as appendix A to this opinion. The Court finds that the record below sustains the findings of fact as set forth by the special master.

At oral argument before this Court, counsel for respondent stated with commendable candor: "If the analysis of the Court stops at the four corners of paragraph 8, then Mr. Lowther would stand indicted", and then proceeded to ask that we view numerous other circumstances to determine what respondent intended by the drafting of paragraph 8. Courts have always been reluctant to permit parties to vary the terms or explain the meaning of written agreements by parol evidence. ¯We have great difficulty in perceiving any sound legal basis for using this type of evidence for the purpose of explaining what an attorney meant by the writing of such a paragraph, especially in an agreement in which he was financially interested. The appearance of professional misconduct can in some instances just as effectively undermine the confidence of the public in the integrity of the attorney and the legal profession as proven misconduct itself.

The duty to explain or justify the actions or conduct of members of the legal profession, or any other profession, is not cast upon this Court, but rather upon the person who would hold himself out to the public as a member of the profession. The charge as made is sustained and the conduct subject to disciplinary action by this Court.

II

We do not at this time deem it necessary to decide the extent to which we might in the future invoke the Rules of Professional Conduct, as our sister state of Colorado has done, *People v. Pittam,* 194 Colo. 104, 572 P.2d 135 (banc 1977), to determine the standard of conduct applicable to attorneys in the performance of their partnership agreements. The primary purpose of the Code of Professional Responsibility is protection of the public, not the protection of attorneys from attorneys.

The record before us sustains the findings of fact of the special master as to Count II.

---

United States Lime and Mining Corporation and Metals Corporation of America will convey and assign to W. E. Parker, Lloyd R. Parker, M. W. Crabtree, Hubert Lay and Gerald H. Lowther, a two per cent (2%) interest in and to all properties now owned or hereafter acquired and in any properties or assets in which an interest is secured or maintained, legal or equitable, by E. M. Riebold, United States Lime and Mining Corporation or Metals Corporation of America. It is understood and agreed that the two per cent (2%) interest carries with it additional interest in the Morenci deal and the Klondyke deal referred to in the original contract with Founders and United States Lime and Mining Corporation and Metals Corpora-

tion of America and where they bought a fifteen per cent (15%) interest and received four per cent (4%) of the Klondyke deal and three per cent (3%) of the Morenci deal, that their interest in Morenci and Klondyke are increased proportionately. E. M. Riebold, United States Lime and Mining Corporation and Metals Corporation of America shall immediately execute the necessary documents to convey the above mentioned two per cent (2%) interest and Founders of American Investment Corporation shall be under no obligation to arrange for the borrowing of the $200,000.00 mentioned herein, or any part thereof, until these deeds, assignments and conveyances are made and delivered.

We simply note that respondent's pattern of self dealing was carried over into law firm partnership and to that extent is supportive of our conclusion as reached in Count I above.

"To disbar, it should be clear that [the lawyer] is one who should never be at the bar . . . ." *In re Sullivan*, 494 S.W.2d 329, 334 (Mo. banc 1973). Giving deference to the facts, circumstances and recommendations found by the special master, we do not find that the public would be protected or that the ends of justice would be reached by disbarring respondent. Accordingly, he is suspended indefinitely from the practice of law with leave to apply for reinstatement after a period of one year from the date of this opinion. The costs of these proceedings, are, as well, taxed against him.

DONNELLY, WELLIVER and HIGGINS, JJ., and STOCKARD, Special Judge, concur.

SEILER, J., concurs in result in separate opinion filed.

MORGAN, J., dissents in separate dissenting opinion filed.

BARDGETT, C. J., dissents and concurs in separate dissenting opinion of MORGAN, J..

RENDLEN, J., not sitting.

APPENDIX A

REPORT OF SPECIAL MASTER

May, 6, 1980

FINDINGS OF FACT

[Count I]

This is a disciplinary procedure instituted by the Advisory Committee of the Missouri Bar Association against GERALD H. LOWTHER who has practiced law in Springfield, Missouri since 1951. The information was filed on April 7, 1978 in the Supreme Court and is in three counts; however, the third count was withdrawn with prejudice during the hearing before the Special Master and, at the end of the evidence, submitted by the Advisory Committee.

The transcript of the testimony is in four volumes, the pages of which are continuously numbered. The charge contained in Count I shall be considered first.

After alleging that the Respondent, while engaged in the practice of law in Springfield, did wrongfully, unethically, unprofessionally and in violation of his duties as a lawyer, engage in and was guilty of professional misconduct, Count I states:

"that in December of 1968, he did use his position as attorney for and director and officer of the FOUNDERS OF AMERICAN INVESTMENT CORPORATION to obtain personal advantage by use of a contract entered into by the corporation, thereby obtaining one-fifth of 2% of certain mining interests as a condition precedent to the corporation guaranteeing certain loans for other parties to the contract, contrary to DR 1–102(A)(4) and (5), DR 5–101(A) and DR 5–104(A), Rule 4 Supreme Court of Missouri."

In late 1964 or early 1965, Respondent handled the legal work necessary to incorporate FOUNDERS OF AMERICAN INVESTMENT CORPORATION, hereinafter referred to as FOUNDERS. It was organized as a holding company to form affiliated life insurance companies in states other than Missouri.

FOUNDERS was conceived and organized by W.E. "Tiny" Parker (he was its largest stockholder) who acted as its President and Chairman of the Board (T. 65, Pg. 483). He selected all members of the Board and it is conceded by both the attorneys for the Committee and the Respondent that he was a dominant figure in FOUNDERS and a very forceful and dynamic man (T. 108, Pg. 266).

FOUNDERS was a widely held corporation headquartered in Springfield, Missouri. It was estimated that there were about 7,000 stockholders, holding outstanding shares of approximately one million five hundred thousand. It was estimated by "Tiny" Parker that the directors owned about 190,000 or 195,000 shares (T. 817–818). The board members at all times rele-

vant to this inquiry were the Respondent, Gerald H. Lowther, W. E. "Tiny" Parker, Lloyd Parker, Hubert Lay of Houston, Missouri, Gerald Orscheln of Moberly, James H. Carter of Topeka, Kansas, M. W. Crabtree of Chillicothe and Tim Murrell, an attorney, with offices in Topeka, Kansas (T. 985).

Floyd Parker, Pat Crabtree and Hubert Lay were members of the Board of Directors of the MODERN AMERICAN LIFE INSURANCE COMPANY and the other members of the Board of FOUNDERS were involved, either as an agent or investor or employee of the MODERN AMERICAN LIFE INSURANCE COMPANY or were involved in other life insurance companies which had been formed by W. E. "Tiny" Parker.

The legal representation by MODERN AMERICAN and FOUNDERS was divided between Lay, Murrell, and Respondent with Lay and Murrell handling matters relating to securities (T. 985), stock issues, and preparation of prospectus, and Respondent handling litigation matters for both MODERN AMERICAN and FOUNDERS, incorporation and qualification of affiliated companies in other states, and the legal requirements pertaining to the mining claims in which FOUNDERS invested in 1968 (T. 986).

In January of 1968, FOUNDERS became interested in certain mining claims in New Mexico and Arizona. This interest resulted after a Dr. Thomasson of Springfield and a shareholder in FOUNDERS requested that he be allowed an opportunity to speak to the Board about the possibility of investing FOUNDERS' money in the mining business. "Tiny" Parker extended an invitation to Dr. Thomasson to appear before the Board and he did so on January 30, 1968. The mining interests which were thus called to the attention of the Board of Directors of FOUNDERS were located in New Mexico and Arizona and were owned and controlled by U. S. LIME & MINING CORPORATION, hereinafter referred to as U.S.L.M., and METALS CORPORATION OF AMERICA, hereinafter referred to as M.C.A. A Mr. E. M. Riebold either wholly owned or

managed U.S.L.M. and M.C.A. The FOUNDERS Board became acquainted with Mr. Riebold through Dr. Thomasson (T. 766) (R.Ex.10).

After Dr. Thomasson's presentation, the FOUNDERS retained a William Hayes (who the evidence showed to be a reputable geologist) to investigate the mining interest and to make a recommendation to the Board (T. 998). Dr. Hayes, accompanied by Mr. Lowther, "Tiny" Parker and M. W. Crabtree, made an inspection trip and, on such trip, the group talked with various geologists and mining engineers and made an inspection of the property. Mr. Lowther, the Respondent, conducted his own inspection of the mining claim and learned from Mr. Riebold that a joint venture was being negotiated between Mr. Riebold and Joseph Mueller Corporation of Zurich, Switzerland. It appeared that it was the intention of Joseph Mueller Corporation to provide technological assistance and all financial assistance and Mr. Riebold, as General Manager of U.S.L.M. and M.C.A. was to supply the mining property (T. 1000–05).

The evidence showed that Joseph Mueller Corporation was reputed to have an excellent reputation with an abundance of resources, credit and experience.

Even though Mr. Riebold owned 100% of the U.S.L.M. stock, he had pledged all of the stock to a Mr. Yates as collateral for a loan in excess of $500,000.00. A letter dated November 15, 1967 from the Mueller Corporation showed some concern that Mr. Riebold was not in complete control of the two companies who owned the mining claim. It was considered important for the success of the mining operation that the Mueller Corporation provide the technological assistance and financial assistance in order for the Mueller Corporation to become a joint venture with Mr. Riebold and his two corporations (T. 172, 1001) (R.Ex.3).

On March 1, 1968, at a special meeting of the Board of Directors of FOUNDERS, a motion was made and carried whereby FOUNDERS would offer to buy all interest of Mr. Harvey Yates in U. S. LIME & MINING CORPORATION for the sum of

$250,000.00 and authorized "Tiny" Parker to negotiate with Mike Riebold for the purchase of a 15% interest in land in which the U.S.L.M. had an interest, 15% interest in which METALS CORPORATION OF AMERICA had an interest, a 3% and a 4% interest in holdings of other properties for the sum of $245,000.00, making a total payment by FOUNDERS of $495,000.00. (Stipulation of Facts, Par. 2).

In paragraph 3 of the Stipulation of Facts, it is stated that on March 6, 1968, FOUNDERS OF AMERICA [sic] INVESTMENT entered into an agreement with E. M. Reibold, [sic] U.S.L.M. and M.C.A. Corporation, wherein FOUNDERS agreed to purchase a fifteen (15%) per cent interest in certain holdings of U.S.L.M. Corporation and M.C.A. Corporation for the stated sum of $245,000.00. In addition, $250,000.00 was paid to redeem the stock held by Harvey Yates.

It was stipulated by the parties that, on March 14, 1968 the Board of Directors of FOUNDERS ratified the contract of March 6, 1968 and separating Harvey Yates, Jr. of all interest in the U.S.L.M. for the sum of $250,000.00 and the payment of an additional $245,000.00 to U.S.L.M. Corporation and Metals Corporation of America for a 15% interest in certain lands owned or may be in the future acquired, and a 3% and 4% interest in other claims. In addition, W. E. "Tiny" Parker announced that an additional $200,000.00 interest might be available if the Board desired to invest their own personal money, under the same terms and conditions of the March 6, 1968 agreement (CO. Ex. 4) (Stip. Par. 5).

On August 17, 1968 the shareholders of FOUNDERS approved the Board's action on mining interests in Arizona, New Mexico and Mexico (Stip. Par. 7).

While "Tiny" Parker and Mr. Riebold negotiated the contract of March 6, Mr. Lowther accompanied "Tiny" Parker on the trip and sat in on the negotiations and, hence, was able to prepare the contract dated March 6, 1968. The stock held by Mr. Yates as collateral for a loan to Mr. Riebold, which was redeemed by FOUNDERS, was delivered to U.S.L.M. and M.C.A. and "Tiny" Parker personally negotiated this purchase of redemption with Mr. Yates.

At the March 14, 1968 meeting of the Board of FOUNDERS, it was informed that an additional 5% interest in U.S.L.M. and M.C.A. was available but the Board decided that FOUNDERS should make no further investment in these properties. It was then announced by "Tiny" Parker that an additional $200,000.00 interest might be available if the individual members of the Board desired to invest their own personal money. Seven of the eight Board members elected to individually invest in the mining claims after which "Tiny" Parker entered into negotiations with Mr. Riebold as to the terms of their investment (Stip. Par. 5). As a result of these negotiations, the seven individual members of the Board entered into an agreement with Mr. Riebold, U.S.L.M. and M.C.A. dated March 29, 1968 wherein W. E. "Tiny" Parker, Lloyd R. Parker, M. W. Crabtree, Hubert Lay, Gerald H. Lowther, Tim Murrell and James Carter agreed to purchase from Mike Riebold, U. S. LIME & MINING CORPORATION and METALS CORPORATION OF AMERICA a 5% interest in certain mining claims for the sum of $250,000.00, which $250,000.00 was paid in cash by the individuals (Stip. Par. 6).

"Tiny" Parker had urged the individual members of the Board to put their own money in the undertaking and it seemed to be agreed among the members of the Board that it was a good policy to invest their own individual funds in an investment they made for FOUNDERS to show their faith in the decisions that were made (T. 76–77, 777). All of the Board members participated in the purchase of the 5% interest except Mr. Orscheln who told the other members of the Board he was expanding his farm supply store and did not have the capital. (T. 1018). Each of the seven individual members paid an equal amount for an undivided 5% interest. They paid $50,-000.00 for each percentage point while FOUNDERS had paid $33,000.00 for each percentage point (T. 1014, 779, 905). Mr. Lowther drafted the March 29, 1968 agree-

ment and was present during much of the contract negotiations.

It can be said at this point that such purchase by the Board of Directors is not viewed by the Special Master as being improper in arriving at a decision in these proceedings.

On August 17, 1968 the shareholders of FOUNDERS approved the Board's action mining investments in Arizona, New Mexico and Mexico (Stip. Par. 7).

After FOUNDERS had purchased a 15% interest and after a 5% interest was conveyed to the individual members of the Board, "Tiny" Parker and Mr. Lowther traveled to Phoenix, Arizona on behalf of FOUNDERS to meet with Mr. Riebold and the Joseph Mueller Corporation. Efforts were being made to work out the final details of the joint venture contract between Mr. Riebold and the Mueller Corporation. Although Mr. Lowther was in Phoenix, Arizona at the time and talked with the principals including Joseph Mueller, he did not actually engage in the negotiations. However, he left Phoenix, Arizona with the impression that a joint venture agreement was a foregone conclusion and that only certain details remained to be ironed out. (T. 1053).

Prior to October 16, 1968, negotiations between the Mueller Corporation and Mr. Riebold broke off and it became apparent that a joint venture with Mueller Corporation would not materialize. Mr. Lowther testified that he was at a loss to explain why the Mueller Corporation pulled out of the negotiations (T. 1054).

On October 16, 1968, the FOUNDERS Board met and the minutes of the meeting state in part:

"that it would probably be three years before the mining operations would be developed and, at the present time, some land had been sold providing a cash flow into the company." (Stip. Par. 8).

Mr. Lowther testified, however, that up until October of 1968, FOUNDERS had realized no cash flow at all out of its investment in the mines (T. P. 1056). Other attempts to develop mining operations were made but such attempts were unsuccessful.

On November 4, 1968 the FOUNDERS Board met and "Tiny" Parker announced that additional money was needed in order to get the mining facilities in New Mexico and Arizona into operation. (Stip. Par. 9). Mr. Riebold and members of his mining engineering staff appeared in person and gave a report and stated there was a need for $460,000.00 (Stip. Par. 9). Mr. Riebold stated that the money would be used to put into operation certain properties located in Old Mexico and that this would produce a substantial cash flow. These properties located in Old Mexico were unrelated to the mining operations located in Arizona and New Mexico in which FOUNDERS and individual Board members had an interest (Pg. 1075).

Mr. Lowther testified that, following the Board meeting, the Board members met informally and decided that they should not loan any more than $200,000.00 to Mr. Riebold and his associates (T. 275, 793). Mr. Riebold agreed to pledge all of his interest in the mining operation as security for the loan. (COM. Ex. 12).

At the Board meeting of November 4, 1968, a motion was made, seconded and carried that "Tiny" Parker and Gerald Lowther make a trip to Old Mexico and visit the properties in Arizona and New Mexico and bring back their opinion on the matter. (COM. Ex. 8).

One or two days before Thanksgiving 1968, Mr. Lowther left for Mexico to investigate the mines and, on Thanksgiving Day, "Tiny" Parker and Mr. Crabtree left for Mexico to begin an investigation of the mines (T. P. 1066, 1067).

Mr. Lowther, Mr. Crabtree and "Tiny" Parker did investigate the properties in Mexico in an effort to determine whether an investment in the property was feasible and Mr. Lowther met with Mexican attorneys and with certain engineers to determine whether the leases on the mine were valid. (T. P. 1070, 1071). It was about this time that a 2% interest was conveyed by an assignment dated November 27, 1968 from

U.S.L.M. to "Tiny" Parker, Lloyd Parker, Gerald Lowther, M. W. Crabtree and Hubert Lay in certain mining properties in Grand and Sierra Counties in New Mexico and Graham County in Arizona. And also a 2% interest was conveyed by an assignment dated November 27, 1968 from M.C.A. to "Tiny" Parker, Lloyd Parker, Gerald Lowther, M. W. Crabtree and Hubert Lay in certain mining properties in Sierra, Hidalgo and Catron Counties in New Mexico and Graham and Greenlee Counties in Arizona (Stip. P. 10, 11).

The group that investigated the property in Old Mexico felt that it had a "lot of potential" because the price of silver was fair and the minimum wage was $2.00 a day at the site.

While arrangements for a loan with the Empire Bank of Springfield were made by "Tiny" Parker on November 4, 1968 to the extent that a loan commitment was received, it was not until after the investigation was made by "Tiny" Parker, Mr. Crabtree and Mr. Lowther that a promissory note payable to the Empire Bank in the sum of $152,000.00 was made on December 3, 1968 signed by FOUNDERS, U.S.L.M. and M.C.A. and E. M. Riebold and Raymond [sic] Rincon. (T. 85, 799, 1066–1067).

On December 4, 1968 an agreement (prepared by Gerald Lowther at the direction of "Tiny" Parker, President of FOUNDERS) was entered into whereby FOUNDERS agreed to guarantee a loan for U.S.L.M. and M.C.A. and Mr. Riebold and Raymond [sic] Rincon and certain corporations incorporated in Mexico which Mr. Riebold controlled or owned. Said loan to be "up to $200,000.00 and executed a promissory note for repayment of said sum." Paragraph 8 of said agreement stated:

"In consideration of the payment of Ten ($10.00) dollars and other valuable considerations, the receipt and sufficiency whereof is hereby acknowledged, and as consideration for FOUNDERS OF AMERICAN INVESTMENT CORPORATION signing said notes not to exceed an aggregate sum of $200,000.00. It is agreed that E. M. Riebold and United States Lime and Mining Corporation and Metals Corporation of America will convey and assign to W. E. Parker, Lloyd R. Parker, M. W. Crabtree, Hubert Lay and Gerald H. Lowther a two (2%) per cent interest in and to all properties now owned or hereafter acquired and in any properties or assets to which an interest is secured or maintained, legal or equitable, by E. M. Riebold, United States Lime and Mining Corporation or Metals Corporation of America. It is understood and agreed that the two (2%) per cent interest carries with it additional interest in the Norenci [sic] Deal and the Klondike [sic] Deal referred to in the original contract with FOUNDERS and the United States Lime and Mining Corporation and Metals Corporation of America and where they bought a fifteen (15%) per cent interest and received four (4%) per cent of the Klondike [sic] Deal and three (3%) per cent of the Norenci [sic] Deal that their interest in Norenci [sic] and Klondike [sic] are increased proportionately. E. M. Riebold, United States Lime and Mining Corporation and Metals Corporation of America shall immediately execute the necessary documents to convey the above mentioned two (2%) per cent interest and FOUNDERS OF AMERICA [sic] INVESTMENT CORPORATION shall be under no obligation to arrange for the borrowing of the $200,000.00 mentioned herein, or any part thereof, until these deeds, assignments, and conveyances are made and delivered." (Stip. 14).

On December 10, 1968 at a special meeting of the Board of Directors of FOUNDERS, the minutes reflect that "Tiny" Parker reported the contract dated December 4th, whereby FOUNDERS agreed to sign a note or notes up to $200,000.00 as principal with E. M. Riebold, Rincon, U.S.L.M. and M.C.A. for use in development of mines and mining property. As consideration for executing said note or notes, FOUNDERS would be paid 5% of all sums due from the smelter to the Mexican corporations or any other parties executing the note for a period of five years on certain named proper-

ties. "Tiny" Parker also announced that, on December 3, 1968, a note was executed with Mr. Riebold, M.C.A., U.S.L.M. and Rincon with the Empire Bank of Springfield, A motion to approve said action was made, seconded and passed. (Stip. P. 15).

The stipulation further shows that, on December 19, certain assignments were recorded and that, on February 28, a note was executed by the parties in the sum of $20,-000.00 and on May 22, 1969 a note in the sum of $28,000.00 was executed pursuant to the agreement of December 4.

The investment in the mining interest was a complete loss to both FOUNDERS and the individual members who purchased an interest. Mr. Lowther testified that over and above his initial investment to purchase "5% interest, he lost between $66,-000.00 and $67,000.00 through his involvement with the New Mexico and Mexican mines." (T. 1100).

The Advisory Committee contends: (Com. B. p. 29)

1. that, prior to the execution of the March 29 contract, Mr. Riebold never promised to convey free of charge an additional 2% interest.

2. that no consideration was paid by the individuals for the 2% interest.

3. that any oral promise made by Mr. Riebold prior to the March 29th contract was unenforceable, and

4. that Mr. Lowther did use FOUNDERS' assets to obtain a one-fifth undivided interest in 2% of certain mining interests.

Respondent contends the Board members had the assurance of Mr. Riebold that, if a joint venture was not consummated with Joseph Mueller within six months, an additional 2% interest would be conveyed to them so the individuals would be paying the same price per point as did the corporation.

The March 29, 1968 agreement for the purchase of the 5% by the individual Board members (COM. Ex. 5) was reduced to writing by Respondent pursuant to "Tiny" Parker and Mr. Riebold's relation of the terms and the only consideration recited therein is as follows:

"For the consideration of ten ($10.00) dollars and other valuable considerations, receipt and sufficiency whereof is hereby acknowledged, parties of the second part give, etc."

There is no reference to any prior oral promise of Riebold to equalize the cost of investment of the individuals with that of FOUNDERS in the event the Mueller joint venture failed to materialize within six months.

Mr. Lowther, the Respondent, testified that prior to the seven board members contracting to purchase an interest in the mining operations, he became concerned that the seven individuals were paying more for their percentage point interest than FOUNDERS and, therefore, he asked "Tiny" Parker and Mr. Riebold why the individuals should make such an investment at a price that was $17,000.00 a point more than FOUNDERS had paid. According to Mr. Lowther's testimony, Mr. Riebold stated that (Abstract p. 1039):

"We're going to get our money back in six months because the Mueller deal is going to be completed. They are going to pay an entrance fee. Everything will be fine and, if we don't I'll convey you another 2% and then that will bring your cost down to about what FOUNDERS paid for their interest."

However, the contract contained no language which obligates Mr. Riebold to convey another 2% interest without an additional payment of $100,000.00. It does grant the seven individuals an option to purchase an additional 2% interest in the assets of Riebold, U.S.L.M. and M.C.A.

"Tiny" Parker testified by deposition with reference to the promise of Mr. Riebold (T. pp. 780, 781) as follows:

"We was also told by Riebold on the way back to the airport at the time that contract was executed that he was working on a deal on the Commonwealth claims and he pointed to them right over there on the Santa Rita above the Kennicot Pit there, which was impressive and he was working on a deal to sell a group interest

in these claims for $8,000,000.00 and he said 'we will all have our money back when I sell this claim and we will be home free and I will guarantee I will have it done within six months.' Again, on page 782, he said 'we would all have our money back within six months or he would make it up to us in some manner by issuing us some additional interest and he would guarantee it, it would happen in six months. If it did not, he would treat us right. This is the words he told us."

"Tiny" Parker testified the he kept pressing Mr. Riebold for the 2% conveyance after the six months elapsed and Mr. Riebold would say, "Don't worry, I will take care of it, I will take care of you boys."

"Tiny" Parker, as well as Respondent, testified that the two per cent conveyance had nothing to do with the granting of the loan.

The deposition of Mr. Riebold was read in evidence and his testimony is contradictory and incredible with reference to whether the promise was made, the nature of the promise and uncertain as to whether or not influence or pressure was exerted upon him to make the assignment of the additional 2% interest to the individual members of the Board in order to obtain the $200,000.00 loan. At one point (T. pp. 608–609), when "Tiny" Parker and Mr. Riebold were negotiating and having an argument about the price of $50,000.00 and "Tiny" Parker was pressing him for additional stock he stated:

"I do not remember just exactly how I did that but I do know I sold them 5% and I do know that they came by another 2%. As to how that happened, I don't know but my negotiation was completely with "Tiny" Parker ..."

At another point (pp. 613–614), Mr. Riebold testified, referring to his negotiations with "Tiny" Parker, that:

"he (Parker) wanted some more interest in our corporation for the deal that the officers of the company put up. He wanted to fatten his position to where they were [not] injured. Now, I don't remember just exactly what I said or how I said it or what I did or anything else,

but I do know that that is what we agreed on and I do know that Mr. Mueller did not close the deal and I do know that I gave them the 2% under the same circumstances—I do know that."

At transcript pages 613–614, Mr. Riebold was asked the following question:

"And your promise, as I understand, was that if the Mueller deal did not close in six months, you would give these individuals another 2% so as to more equitably distribute their cost in the investment. Is that correct?

Answer: "We had a general understanding at that time that I would fatten their position if we didn't do something."

As to whether the conveyance of a 2% interest was influenced by the fear he would not obtain the loan, Mr. Riebold testified (Abstract p. 6531) as follows:

"because even though he (Parker) didn't say it, and he may not have meant it, but you have to understand my position and I, in no way, want to cast any reflections against anyone because that is going to get us nowhere. I needed the money, as I told you before. Mr. Parker was a tough negotiator, and I knew that I had to deliver that 2% one way or the other, and I felt that I probably had better deliver it but that was from 'Tiny' Parker."

And as to the question (Abstract p. 654):

"Question: So, you just wanted to be sure that you got the loan and you made the assignment to get it?

Answer: I think that would be an honest statement."

While there is no direct evidence that anyone said to Mr. Riebold "if you don't convey to us the 2% you will not get the loan", it is apparent Mr. Riebold 'got the message.'

Mr. Ira Liddell Long, who was secretary of the U.S.L.M. and M.C.A., testified by deposition (Tr. 892) that he signed the agreement dated March 6, 1968 as secretary of the two corporations. He further testified that he did not assist Mr. Riebold in any respect in negotiating the agreements.

He became acquainted with a man named W. E. "Tiny" Parker and Pat Crabtree and Gerald Lowther and Hubert Lay and he heard about the 2% promise. But he heard no statement by Mr. Riebold to any of the members of the Board and his testimony is based solely upon what Mr. Riebold told him and he could not remember when the promise was supposed to have been made. (Tr. p. 918).

Ellis B. Harrington testified that he was a graduate engineer and worked at one time for M.C.A. and U.S.L.M., first as a consultant, then as an engineer and became a corporation officer for a time in 1968. He further testified that he was "not in on any" of the negotiations and he heard no conversation between Parker or Lowther or Riebold.

Hubert E. Lay (Tr. 64), an attorney, was a member of the Board of Directors of FOUNDERS and participated in the purchase of a 5% interest. Therefore, he would be one of the individuals for whom the alleged promise was made and yet he testified that no one ever told him that there was going to be an additional interest conveyed to them by Mr. Riebold. No one discussed it in his presence.

The testimony of Marian Wilson Crabtree (Tr. 299), given before the Advisory Committee of the Missouri Bar, was read in evidence and he stated that he had paid between $35,000.00 and $42,000.00 for an interest in the mining operation but he received no evidence, nor did he know of, nor did he ever hear discussed, a promise to convey an additional 2% upon any condition.

Taking into consideration all the testimony and the evidence presented, the Special Master finds that no promise was made by Mr. Riebold to "Tiny" Parker and Gerald Lowther to convey an additional 2% to the individual members of the Board and any promise that might have been made, as contended by Respondent, would not be enforceable.

Under Mr. Lowther's own testimony, the promise was not clear and definite. It was contingent upon "the Mueller deal being completed and getting our money back in six months." Certainly, if such alleged promise was made and was a consideration in the individual Board members' agreement to purchase a 5% interest, it should have been so stated in such agreement. The fact FOUNDERS got an interest for less than $50,000.00 is no valid reason for the promise not being included in the agreement. The testimony of Respondent himself was to the effect that there were many who knew of it. Mr. Crabtree and Mr. Lay, who participated in the purchase of the 5% interest, testified that they never heard of any such promise to convey an additional 2%. Mr. Carter and Mr. Murrell were not named as grantees in the 2% conveyance although they would have been entitled to be so named with the other grantees in the conveyance.

There is no evidence that Mr. Riebold's alleged promise to convey 2% to the individual members of the Board was ever mentioned at a stockholders meeting at any time.

Respondent contends that the members of the Board who purchased 5% interest paid $50,000.00 a point whereas FOUNDERS paid about $33,000.00 a point and the alleged promise was made to "equalize" the cost of the Board members with the cost to the FOUNDERS. As the Committee brief points out, FOUNDERS invested $495,-000.00 in the mining interests which "increased the chances for a profit as a result of Mueller's involvement."

The assignment of a 2% interest is dated November 27, 1968—six days before the date of the agreement by FOUNDERS to borrow up to $200,000.00 by signing notes as principal with Riebold, Rincon, U.S.L.M. and M.C.A. The conveyance was also made after the Board of Directors had authorized Mr. Lowther, "Tiny" Parker and Mr. Crabtree to investigate the mining interests and prospects and, when Mr. Riebold badly needed the money, if any progress at all was to be made.

The agreement of December 4, 1968 wherein FOUNDERS agreed to borrow up to $200,000.00 specifically states that as

part of the "consideration for FOUNDERS OF AMERICA [sic] INVESTMENT CORPORATION signing said notes,["] ... ["]is agreed that Riebold and his companies will convey and assign to the five named members of the Board of Directors the 2% interest." It is further stated that FOUNDERS "shall be under no obligation to arrange the borrowing["] ... until the deed, assignment and conveyance is made and delivered. This language is clear, emphatic and unambiguous.

The Respondent's explanation that "Tiny" Parker wanted it in there "so that somewhere along the line, if we ever have to enforce it (the alleged additional 2% promise), why we'd have some acknowledgement from Mr. Riebold that that is his agreement" is not a valid reason for its inclusion. Mr. Lowther was the lawyer, not "Tiny" Parker.

While at the time the oral promise was alleged to have been made Mr. Lowther may not have been negotiating for and in behalf of FOUNDERS, yet he did not lose his role as counsel for FOUNDERS.

It is in evidence that the Board reported to the stockholders their investment in the mines but there is no showing that the stockholders were informed of any agreement that the members would obtain an additional 2%. It is also in evidence that the 2% which was so valued at the time, was conveyed to only five—omitting two persons who should have benefitted.

The Special Master finds that Mr. Riebold did give general assurances of bounteous returns and to relieve any indecision of Mr. Parker and Mr. Lowther, made statements such as "you will all have your money back in six months", "I will treat you right", "everything will be fine" but one cannot raise such "sales talk" to definite, dependable, enforceable promises.

Mr. Parker testified they were oversold (Abs. p. 779) and we find that such statements were part of the "selling". As time went on and expectations of big returns diminished, then faded, the sales talk of Mr. Riebold became promises of definite action.

Gerald Lowther, as a member of the Bar, is held to a higher degree of open and fair dealings in matters in which his client is involved than a layman and Respondent's emphasis on "Tiny" Parker's domineering and forceful manner does not excuse Mr. Lowther's conduct.

When Mr. Lowther purchased an interest in the mines, his acquisition was not necessarily in conflict with FOUNDERS but, at the time Mr. Riebold was persuading FOUNDERS to obtain a loan, "Tiny" Parker and Mr. Lowther were persuading Mr. Riebold for a conveyance of a 2% interest and Respondent placed himself in a conflicting position.

It should also be pointed out that the conveyance of 2% by Mr. Riebold, M.C.A. and U.S.L.M. reduced the assets of Riebold, M.C.A. and U.S.L.M. by such amount and the latter three agreed to hold Mr. Lowther's client, FOUNDERS, harmless.

Taking into consideration all the evidence in the case, Mr. Lowther's handling of the legal affairs of FOUNDERS from its inception, his familiarity with all the phases of FOUNDERS involvement in the mining interests with Riebold and others, the desperate urgency of Riebold and his group for additional and substantial financing, the negotiatiations [sic] and provisions in the making of the loan of $200,000.00, the drafting of the loan agreement by Respondent relieving FOUNDERS from any obligation to make the loan unless the 2% interest was conveyed to the individual stockholders, the relationship of the parties, Mr. Lowther's personal interest and resulting personal benefit, the sequence and timing of events, Respondent's knowledge of the need of written agreements all lead to but one reasonable conclusion of the issue ... that he did use his position as attorney for and director of FOUNDERS to obtain personal advantage by use of the loan contract entered into by the corporation, thereby obtaining one-fifth of 2% of certain mining interests by making it appear to Riebold that it was a condition precedent to the corporation guaranteeing certain loans for other parties to the contract. It is further

found by the Special Master that such conduct is in violation of the ethics of the legal profession.

## COUNT II

### STATEMENT OF FACTS

In Count II, the charge against Gerald H. Lowther is that, during the time from March 1968 until June 1, 1974, he did fail to report and pay to the firm of Miller, Fairman, Sanford, Carr and Lowther, of which he was a member, certain retainers which he received from FOUNDERS and MODERN AMERICAN and further did take steps to conceal the fact that such retainers were being paid to him by said clients and retained by him, contrary to his obligation to said firm and contrary to a written partnership agreement entered into in January of 1970.

Gerald Lowther, the Respondent herein, began the practice of law in 1951 in Springfield, Missouri with the law firm of Miller and Fairman. In 1954, he became a member of the firm of John Miller, John Fairman, William Sanford and John Carr.

There was no written partnership agreement until January 29, 1970 on which date a partnership agreement was executed by J. Weston Miller, William P. Sanford, John F. Carr, Gerald H. Lowther, F. William Joyner, Henry Westbrooke, Jr. and Peter C. Charles.

The partnership agreement consisted of over 30 pages and among many other things, required all retainer fees received by individual partners to be deposited in the firm account (Commitee's [sic] Exhibit 20, Page 23). A management committee with broad powers was set up which consisted of three members of the firm and, among its powers, was to determine drawing accounts, withdrawals and advancements (page 7). It was authorized to determine many questions that would arise in the division of funds among the partners. For example, a "Bonus Fund" was established which was to be divided "between such partners and in such proportions as the Management Committee may determine at the end of each

year." Considerations to be used by the Committee were set out, such as production of business, a partner's benefit to the firm, and other reasonable "bases to be considered." Altogether, four funds were set up: a Capital Fund, a Bonus Fund, a Fixed Income Fund and Incentive Fund.

The "collectible billings of each partner" had a large part in determining a partner's share. There was also provisions for considering special services to the firm, recommendations of the management committee and any other partner and overall value to the firm. The evidence shows that the Management Committee did not function as one would anticipate from a reading of the contract. It had few, if any, meetings, made no recommendations as a group, did not determine allocations or, *as a Committee*, review the billings. The evidence shows that all the partners understood, however, that there was an obligation to pay into the firm, all compensations received for legal work. All members of the firm who testified were cognizant that a partnership agreement existed. Indeed, the very nature of a partnership such as existed here required compensation for legal work to be paid into the firm unless there is a definite and specific understanding otherwise.

Mr. John Miller was the head of the law firm when the Respondent began with the firm of Miller and Fairman. He remained so until the firm was dissolved although, beginning in 1971, Mr. Miller suffered setbacks that hindered his full participation in the firm's activities. It was agreed between counsel representing the Bar Committee and counsel representing the Respondent that Mr. Miller's health was such as to prevent him testifying at the hearing before the Special Master.

The Respondent, during the years of 1968 and 1971, received a retainer fee of $600.00 per month from FOUNDERS OF AMERICAN INVESTMENT. At a special meeting of the Board of Directors of FOUNDERS held on January 13, 1972, that retainer fee was increased by $250.00 per month making a total retainer fee of $850.00 per

month (Committee Exhibit 27, Stipulation of Facts, par. 24). On March 2, 1973, FOUNDERS increased Respondent's retainer fee by $500.00 a month, making the total retainer's fee $1,350.00 per month. (COM. Exh. 22, Stip. par. 25).

From January 1, 1969 MODERN AMERICAN LIFE INSURANCE COMPANY paid Respondent a retainer's fee of $600.00 per month until January 1972, when it was increased by $200.00 per month for a total retainer's fee of $1,000.00 per month and, in September of 1974, this retainer fee was increased $500.00 per month (Stip. pars. 27, 28, 29).

The above increases paid by FOUNDERS and MODERN were separately paid to Respondent and were not paid into the law firm of Miller, Fairman, Sanford, Carr and Lowther (Stip. par. 30). Such increases amounted to a total in excess of $23,000.00 and were kept by Mr. Lowther for his own purposes.

Mr. Lowther's response to the charge of the Advisory Committee is that he "began to feel dissatisfied about the equities of income distribution and the manner in which the expenses were being handled in the firm." (Tr. 1127, 1131). Respondent claims that he was paying a disproportionate portion of the expenses of the firm. He testified that, in December of 1971 or in January of 1972, he

"got some facts and figures together on how much of the expense I had been paying as compared to the others, the many contributions that I was making and that I was spending on new billable things that benefitted the firm. And I went in and asked him (Mr. Miller) if I could get an increase in my two retainers and use these to offset my expenses." (Tr. 1131–1141).

According to Mr. Lowther, he told Mr. Miller

"I had added up the billings that various lawyers had had to show him what I was doing. I told him how much of the expense that I was paying in comparison to the other lawyers. I told him how much time I was spending, serving on the In-

dustrial Development Commission and things of this nature that was unbillable, and participation in politics that brought business into the firm that other lawyers handled and got credit for.

Question: Why did they get credit for it and you didn't?

Answer: Well, it's on the breakdown book as to who does the work." (Tr. 1140–1141).

He testified that

"he (Mr. Miller) gave me permission to go ahead and do this.

Question: To do what?

Answer: To seek an increase in my retainer and use them to offset some of the expenses that I had been out, that benefitted the firm.

Question: Did you tell him at that time how much you were going to seek?

Answer: Yes. I believe I told him how much I was going to seek. Now, I didn't know how much I was going to get and, when asked, 'why didn't you tell this to the other members of the firm', Mr. Lowther responded: 'I guess for the same reason that, if I wanted to go to the International Association of Insurance Council meeting. I didn't go ask Pete Charles and I didn't go ask Bill Joyner. I went to Mr. Miller. If I wanted an adjustment in my drawing account, I went to John Miller. John Miller was smarter than all the rest of us put together. And this was his firm, he was the head man. He was 25 years older than me and, to me, he was the boss." (Tr. 1144).

He also testified (Tr. 1278)

"The reason I didn't go to the other partners was the other partners were the problem and Mr. Miller was the one to solve the problem. I was paying more of the expenses than the rest of them put together. They were the problem and Mr. Miller was the logical one for me to go to rather than to go to the people that presented the problem. I wouldn't get anywhere there. And I assumed Mr. Miller would then communicate it to them."

Respondent contends that the consent of Mr. Miller to Respondent's retention of the increase in the retainers was corroborated by Jean Ann Blansit (Tr. 520), a legal secretary who worked for the Miller law firm. Respondent's brief refers to Mrs. Blansit's testimony as crucial. Mrs. Blansit testified she began working for the firm of Miller, Fairman, Langford, [sic] Carr and Lowther in 1971 as a receptionist but worked for John Miller when his secretary, Mrs. Woods, left on maternity leave (Tr. 523) and was gone for about six months (Tr. 523). When Mrs. Woods returned, she continued on as a receptionist. She testified she was Mr. Miller's secretary beginning in February 1972. She testified that Mr. Miller kept a list of the bigger accounts and what attorney was working on them and that Mr. Miller would go over these retainer fees with me (Tr. 528).

"He told me that the fees of MODERN AMERICAN and FOUNDERS were adequate, that he was pleased with what we were getting and what was coming into the firm because all of it was not being used in the firm. That it was fine, we were getting enough. (Tr. 530–531)"

This is stated to have happened at a time when Mr. Miller was restricted to shorter hours in his working because of his physical condition. He had suffered a personal tragedy in 1970 when his son was killed in July of 1970 in Vietnam and, following that (in August) he suffered a stroke. The evidence further established "He suffered a heart attack in June of 1971 and did not return to the office until September of 1971." Mrs. Blansit's testimony, in the light of all the other evidence, is of little value, if any, in corroborating testimony that he had Mr. Miller's permission to keep the increase in the retainer fees above mentioned.

Mr. Peter C. Charles, an attorney who was employed by the firm to help Mr. Miller testified (Tr. 334) that, in the late 1971 and early 1972, partnership decisions were handled by other partners.

Mr. William Joyner, an attorney, (Tr. 676) became a partner in the firm in 1970 and testified that the procedure set out in the

Partnership Agreement was not followed. He did testify that he knew of no instance where a member of the firm kept a retainer fee without turning it in to the firm. While he heard rumors that retainer fees were retained by a firm member, the first time he knew about it was at the Bar Committee hearing in November of 1977 (Tr. 710). He further testified the money in the firm that was to be divided at the end of the year was distributed after someone (almost any partner) came up with the figures as the contract provided and in a negotiating session, in one way or another, an agreement was reached. (Tr. 709). Many times this was preceded by various members of the firm checking with one another and after full disclosure (Tr. 706–707). He further testified that Mr. Lowther participated in these discussions and did not reveal that he had withheld part of the retainers he obtained in the increases from FOUNDERS and MODERN AMERICA [sic].

Mr. Peter C. Charles, an attorney (Tr. 334) who was brought into the firm by Mr. Miller, testified that at the end of the year for 1970, the members of the firm had each attorneys' billings and that a formula for allocation of fees between the partners set out in the contract was generally followed (Tr. 341). He further testified that a final decision as to the allocation was arrived at by all the partners (Tr. 343). He further testified (Tr. 343) that "by 1971 John Miller had had some health problems and had some further ones—and, from that time on, it was pretty much of a negotiating session each year. Mr. Charles further testified that he examined the books of the partnership and found no record of an increase in the retainers given to Mr. Lowther by FOUNDERS and MODERN AMERICAN and that he did not know of such increase until the hearing of the Advisory Committee of the Missouri Bar held on November 30, 1977. (Tr. 345–347).

Mr. William P. Sanford, an attorney (Tr. 1309), who became associated with the Miller firm in 1947 and became a member in 1960, testified "that there were always dif-

ferences of opinion as to how [distribution of the net profits for the past year should be divided.] ["] He testified that the "firm partnership agreement [. . .] set forth a basis for this." (Tr. 1316). From Mr. Sanford's testimony, the Management Committee did not assume the responsibility of recommending a division but someone

"started out with the firm income and expenses and what the net was going to be and what the billings of each person might be and then drew up a draft as to what their idea may have been as to what the distribution should be." (Tr. 1317)

He testified (Tr. 1317)

"we usually had at least three different and maybe four different possible distributions. Without fixing definitely who might propound these, but Mr. Lowther, for instance, and Mr. Charles and Mr. Carr usually had three proposals. And sometimes Mr. Westbrook [sic] would have one. These would be discussed."

He further testified that

"In 1971, my recollection is we discussed them on several occasions and there didn't seem to be any agreement and then, as I did then and subsequently, I negotiated the final distribution by going first to one partner and then another and talking to them personally and coming up with a distribution which nobody felt acceptable but everybody felt it was the best that we were going to do." (Tr. 1317)

He corrected this testimony by stating that he meant the meeting of 1972, which would have to do with the 1971 business year.

He further testified that, in 1973, the meetings which concerned the 1972 distribution presented more difficulties. He stated that Mr. Lowther had his idea and the others had theirs—and it appeared at that time that the firm was about to break up. He spent, he testified, about ten days negotiating between the groups in order to hold the firm together and he came up with a decision; and he further stated that in 1974, in discussing the 1973 distribution, it was "again a repeat." As he recalled in the 1972 and 1973 meetings, Mr. Miller had very little to say and he did not attend all of the meetings. (Tr. 1318, 1319).

It is true that the written agreement was not followed in many respects. This does not mean, however, that the partners were not obligated to pay into the firm the fees that were earned nor does such failure to follow all or even most of the procedures contained in the agreement destroy the partnership itself or release any and all from other obligations imposed by the contract and that naturally arise from the partnership, as conducted.

The evidence proves that the negotiations over a division of the profits, held soon after each calendar year, were conducted on the premise that each had a statement of income and from what source the income was received as well as a statement of expense. It is also established by the evidence that Mr. Lowther participated in these negotiations. There is no evidence that the fact Mr. Lowther retained for his own personal use a part of the retainer fees was revealed.

Mr. Lowther builds a strong case that, in view of the large per cent of his billings, there was a disproportionate amount of expenses of the firm charged against his billings. His participation in activities that brought business into the firm and that other lawyers in the firm handled and got credit for all, indicated he was bearing a disproportionate share of the expense of the firm. Yet, other considerations may have been advanced by other members of the firm to disprove this claim. The fair method, however, of resolving his difficulty was to bring the matter to the attention of all the partners affected and involved.

His testimony that he obtained Mr. Miller's consent to personally retain the increases in the retainer fees obtained from FOUNDERS and MODERN AMERICAN is hardly credible for several reasons; Mr. Miller's reputation for open and fair-dealing; his reputation as a man of very high principles; as being meticulous makes it highly unlikely that he would consent to

such an arrangement. Mr. Miller's participation in the meeting of the partners of the firm for the purpose of allocating the profits without revealing the retention of fees by Mr. Lowther is contrary to his fine character, to which all of the persons testified. It is unfortunate that he was unable to testify.

In addition, at the time of the alleged consent, Mr. Miller would not know to what he was consenting because, whether or not FOUNDERS and MODERN AMERICAN would consent to a raise in the retainer and, if so, to what amount was unknown either to him or Mr. Lowther. Mr. Miller, though the "head man in the firm" would not have had the authority to so agree in view of the mutual obligations which existed between all the members of the partnership, including Mr. Miller.

The Respondent had a moral and legal obligation to the other members of the firm to report the increase. He did not relieve himself of this obligation by assuming Mr. Miller would do so. Mr. Lowther participated in the negotiations with his partners on several occasions on division of profits, knowing that a basis for the decision was false; to wit, his retention of part of the retainer fees.

The argument advanced that Mr. Miller, on several occasions, consented to a loan or increase in a partner's drawing account is not a precedent for Mr. Miller's alleged consent and cannot be accepted as such for loans or increases were placed upon the books and open to all and could be easily adjusted at the annual distribution.

It is the finding of the Special Commissioner that Gerald H. Lowther did, without the authority, knowledge or consent of his partners personally and improperly deposit FOUNDERS and MODERN AMERICAN retainer fees in his own personal account and such fees rightfully belonged to the partnership.

[Conclusions of Law Omitted]

## RECOMMENDATION

There has been an enormous amount of work put into this case by the Advisory Committee of the Bar and its attorneys, and by the attorneys for the Respondent. The hearing consumed six full days of testimony and the transcript contains over 1300 pages. There are over 150 exhibits. The case was thoroughly prepared and exceptionally well presented and briefed by attorneys on both sides. It is an example of the concern the members of the legal profession have for maintaining high professional ethics and, at the same time, the great value they place upon the privilege to practice law and the necessity for protecting that privilege.

To use the words contained in the case of *In Re Houtchens* [Mo.] 555 S.W.2d 24, l.c. 26, speaking of a proper order:

"Resolution of the problem must start from the oft-quoted statement of this court found in *In Re Randolph*, 347 S.W.2d 91 (Mo.banc) l.c. 109 that: 'The main purpose of a proceeding of this nature is to make an inquiry into the fitness of an attorney to continue in the practice of law. Its main objective is not to punish the attorney but the protection of the public and the maintenance of the integrity of the profession and of the courts.' "Whether or not the 'main objective,' just noted, can be accomplished in this case short of disbarment has been and is a question of grave concern to us. The practice of law, generally, involves situations wherein 'stress' is present and it is imperative that a lawyer have the capacity to deal with the same."

The Respondent bore an excellent reputation in the community and with the members of both bench and bar. He was active in political, civic and charitable organizations. His former partners who testified apparently bore him no ill will and yet, all of this is no defense to the charges proven in this case. Respondent's acts of misconduct must be judged in the light of all the facts and circumstances surrounding his violation.

There is no suggestion that Respondent did not work diligently on behalf of FOUNDERS. There is abundant evidence that the members of the law firm of which Respondent was a member experienced

great difficulties in division of profits ... all these are mitigating circumstances that should be taken into consideration [*People v. Pittam*, 194 Colo. 104, 572 P.2d 135 (banc 1977).]

As has so frequently been pointed out, the purpose is not to punish the attorney but to protect the public. We believe the Respondent would be a useful practitioner in the future if given an opportunity. We do not believe that the protection of the public would be served by disbarment in this case. We believe suspension accomplishes the purpose of this disciplinary proceeding.

Accordingly, it is recommended that Respondent's license to practice law be suspended for a period of one year from the date of the final judgment in this case. We further recommend that the costs be taxed against Respondent.

Respectfully submitted,

S/ David A. McMullan

David A. McMullan
Special Master

I concur.

SEILER, Judge, concurring in result.

I concur in the result, but do not agree that respondent should be disciplined with respect to Count I. In view of what Riebold said as to what he would do about conveying an additional two percent interest in event the directors did not get their money back in six months (as they did not—then or ever) and in light of the fact that they paid $50,000 per point for their 5% as against $33,000 paid per point by Founders (none of this is in dispute), I do not believe we can find or say with confidence that respondent used his position as attorney to obtain an additional interest as a condition precedent to Founder's guarantee of the loan to Riebold. I do not believe the parol evidence rule requires that we close our eyes in this disciplinary action to the explanation offered by Riebold and respondent.

I would dismiss Count I.

However, as to Count II, the undisputed facts are that respondent held out, without the knowledge of the other partners (except as to John Miller), fees which belonged to the partnership. I do not doubt respondent's word that he talked to John Miller about it, but not even John Miller, as senior partner, would have the right or authority to change the partnership agreement as to fees, without the knowledge of and at least the tacit, if not express, consent of the others. Respondent himself acknowledges as much when he testified that he assumed Miller would tell the others. It is apparent from the record that Miller did not so inform the others and equally apparent that respondent could not have helped but realize that the others were unaware of what he was doing. In my opinion this is not the way one partner should conduct himself with respect to partnership fees which come into his possession and I am further of the opinion that this falls short of the standards required of lawyers. I see no escape from this conclusion and therefore concur in the result reached in the per curiam.

MORGAN, Judge, dissenting.

I respectfully dissent for the following reasons:

As to Count I: (1) the factual findings and conclusions reached are not sustained by the evidentiary record presented; (2) the law applied, in effect, tends to disregard the long established rule that disciplinary proceedings are not designed "to punish the attorney"; and, (3) I reject the suggestion that there is something *inherently* wrong or ethically dangerous in an attorney participating with others, be they clients or otherwise, in legitimate business activities.

As to Count II: I do not believe that a disciplinary proceeding is an appropriate vehicle for resolution of financial disputes between law partners.

The general rule of appellate review found in *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976), does not apply to disciplinary proceedings. Although the "findings of fact and conclusions of law" found by the special master are helpful, they are merely

advisory, and not binding. "[T]he ultimate responsibility for finding the facts is ours. It is our duty to make our own decision, *In re Veach*, 365 Mo. 776, 287 S.W.2d 753, 755 (banc 1956)." *In re Weiner*, 547 S.W.2d 459 (Mo.banc 1977).

## I

First, we should find the facts concerning the allegation in Count I, with an outline of events made up of stipulated facts and undisputed testimony. In late 1964 or early 1965, respondent handled the legal work necessary to incorporate Founders of American Investment Corporation (hereinafter referred to as Founders), a holding company organized to form affiliated life insurance companies in states other than Missouri.

Founders was conceived and organized by W. E. "Tiny" Parker. Parker was the corporation's largest stockholder, its president, and its chairman of the board. He selected all members of the board and was, by all accounts, a forceful and dynamic man who was the dominant figure in Founders.

Founders was a widely held corporation headquartered in Springfield, Missouri. It had an estimated 7,000 stockholders holding approximately 1,500,000 shares. "Tiny" Parker estimated that the directors owned about 190,000 to 195,000 shares. The board members at all times relevant to this inquiry were respondent, W. E. "Tiny" Parker, Lloyd Parker (Tiny's cousin),[1] Hubert Lay, Gerald Orscheln, James H. Carter, M. W. Crabtree, and Tim Murrell.

Respondent, Lay, and Murrell[2] were all attorneys and handled the legal work of Founders. Lay and Murrell handled legal matters relating mainly to securities, stock issues, and the preparation of prospectuses. Respondent handled the litigation work for Founders as well as the incorporation and qualification of affiliated companies in other states.

In January 1968, a Founders shareholder, a Dr. Thomasson of Springfield, persuaded Parker to permit him to make a presentation to the board of Founders regarding certain mining claims in New Mexico and Arizona. These claims, about which Thomasson was quite enthusiastic, were owned and controlled by U.S. Lime and Mining Corporation (hereinafter referred to as USLM) and Metals Corporation of America (hereinafter referred to as MCA). It should be noted that Thomasson was himself a shareholder and director of USLM. A Mr. E. M. Riebold owned most of the stock of USLM and was the general manager of both USLM and MCA. The Founders board became acquainted with Mr. Riebold through Dr. Thomasson, although Parker apparently already knew Riebold, both originally being from the same small town in Missouri.

After Dr. Thomasson's presentation, the Founders board hired a highly regard geologist, Dr. William Hayes, to investigate the mining interest and to make a recommendation to the board.

In February 1968, Hayes traveled to New Mexico and Arizona to make a personal inspection of the properties involved. While there, he talked with various engineers, geologists and other knowledgeable parties and examined published geological information on the properties.

Respondent, Parker, and Crabtree accompanied Hayes on this inspection trip. Before, during, and after the trip, respondent made his own investigation concerning the proposed deal between Founders and Riebold's two companies, USLM and MCA. During his investigation, respondent learned from Riebold that a joint venture was being negotiated between Riebold and Joseph Muller Corporation of Zurich, Switzerland (hereinafter referred to as Muller). Muller was to provide financing and technical assistance while Riebold, as general manager of USLM and MCA, was to supply

---

1. Hereafter any reference to Parker means W. E. "Tiny" Parker, unless otherwise stated.

2. Respondent was admitted to the Missouri bar in 1951 and Lay in 1928. Murrell practiced in Topeka, Kansas and was admitted to practice in 1949.

the mining properties. The financing that Muller was to provide was anticipated to be "way up in the millions." Respondent's investigation revealed that Joseph Muller Corporation had an abundance of resources, credit and experience.

Even though Riebold owned the controlling interest in USLM, he had pledged his stock to one Harvey E. Yates as collateral for a loan in excess of $500,000. A letter dated November 15, 1967 from Muller showed concern that Riebold was not in complete control of the two companies which owned the mining claims.

On March 1, 1968, at a special meeting of the Founders board, respondent made a report to the board on the results of his investigation of the proposed mining deals. He then introduced Dr. Hayes, who presented a written and oral report to the board. Hayes was glowing about the mining claims. Hayes' report referred to the claims as being in a "strategic" location, close to operating open pit copper mines of Kennecott Copper and Phelps-Dodge, both major domestic copper mining companies. The report describes some of the land positions as "exceptional." It spoke of a proposed $150,000,000 Phelps-Dodge project for mills and concentrating plants in the area. It made reference to another copper company, Copper Range, which had reportedly recently received $5,000,000 for sale of claims which were close to certain claims of USLM. The report mentioned a diatomite (material used in filters) area held by USLM, close to a claim of Drabo Corporation, which was supposed to be designing plant facilities with annual capacity of 25,000 tons of diatomaceous earth, with planned future increases in 25,000 ton increments.

Hayes told the board that if he had $100,000, he would invest $99,000 of it in the venture.

This was heady stuff and, after Hayes' presentation, the board voted to redeem, for $250,000, Riebold's USLM stock held by

Yates and authorized Parker to negotiate with Riebold for the purchase of a 15% interest in mining land in which USLM had an interest, 15% in which MCA had an interest, and 3% and 4% interests in other holdings (the "Morenci" and "Klondike" deals, respectively) for $245,000, making a total investment by Founders of $495,000.

The next step was a trip by Parker and respondent to New Mexico, where Parker entered into negotiations with Riebold and Yates. Respondent sat in on some of the negotiations. Subsequently respondent prepared the agreement of March 6, 1968 in which Founders agreed to pay $250,000 to redeem Riebold's USLM stock which was pledged to Yates, and in addition, to pay $245,000 to USLM and MCA in consideration for undivided 15% interests in the assets of USLM and MCA as well as small interests in certain other properties. Also pursuant to the March 6, 1968 agreement, respondent was named to the board of directors of both USLM and MCA.

On March 14, 1968, the Founders board ratified the March 6, 1968 contract.

Not only was Founders enthusiastic about the chance for a quick profit; so were the Founders directors individually, so much so that seven of the eight directors decided to purchase an interest for themselves. Riebold had told Parker that an additional 5% interest was available.[3]

Parker then entered into negotiations with Riebold as to the terms of the seven directors' investment. As a result of the negotiations, the seven individuals entered into an agreement, drafted by respondent, made with Riebold, USLM, and MCA dated March 29, 1968, whereby the seven individuals agreed to and did pay $250,000, divided equally among them, for an undivided 5% interest in the mining properties of USLM and MCA, respectively, as well as smaller percent interests in certain other properties. The agreement also contained an option, good for two years, giving the seven di-

---

3. Individual directors had on other occasions made investments parallel to those of Founders, pursuant to Parker's tenet that if they could vote to invest Founders shareholders' money in a project, they should have enough confidence to invest their own money in it.

rectors, or however many of them chose to do so, right to buy an additional 2% interest for $100,000 more.

On August 17, 1968, the shareholders of Founders approved the board's acquisition of the fifteen per cent interest for Founders. There was some evidence that after the formal meeting, the shareholders were also informed of the individual directors' acquisition of the five per cent interest and that no objection was made.

As respondent points out, the $250,000 invested by the directors helped protect the Founders investment. In order to protect the mining claims, Riebold was required to do certain assessment work annually and provide proof of work with the state by August 31. The entire $495,000 put up by Founders for its 15% interest was used to retire the claim held by Harvey Yates against Riebold and his companies. According to the published annual report of USLM for the fiscal year ending March 31, 1968, the corporation had only $704.86 cash on hand, so the $250,000 provided badly needed working capital for Riebold.

Sometime in the spring or summer of 1968, after Founders had purchased the fifteen per cent interest and after the seven directors had purchased the 5% interest, Parker and respondent again traveled to Phoenix, Arizona on behalf of Founders to meet with Riebold and the Joseph Muller Corporation. Efforts were being made to work out the final details of the joint venture contract between Riebold and Muller. Although respondent was in Phoenix and talked with the principals, including Joseph Muller, he did not actually engage in negotiations. He left Phoenix, however, with the impression that a joint venture agreement was a foregone conclusion and that only certain details remained to be ironed out. It was of considerable importance that Muller be involved, because mining ven-

tures and the drilling, extraction, milling and marketing of raw ore require huge amounts of money as well as technical expertise. Muller had a twenty million dollar line of credit with Chase Manhattan Bank and, as previously stated, its financing for Riebold's ventures was to be "way up in the millions."

In September, however, Muller began negotiating with Riebold's brother on a different deal and by the late fall Muller had pulled out of the joint venture with Riebold. Respondent testified that he did not know the reason that Muller pulled out of the negotiations.

In any event, on October 16, 1968, the Founders board met and the board members learned that it would probably be three years before the mining operation would be developed. Founders had realized no cash flow from its investment in the mining claims. It sought other joint ventures to develop mining operations but such attempts were not successful.

On November 4, 1968, the Founders board again met and Parker announced that additional money was needed in order to get the mining facilities in New Mexico and Arizona into operation. Riebold and members of his mining engineering staff appeared in person and gave a report and stated that they needed an additional $460,000. Riebold proposed to use the money to put into operation certain properties located in Old Mexico and expected that this would produce a substantial cash flow.[4] The properties located in Old Mexico were unrelated to the mining operations located in Arizona and New Mexico in which Founders and seven individual board members had their respective interests.

Following the board meeting, the board members met informally and decided that they should not loan any more than $200,-

---

4. One of these properties was a tungsten property near Soyopa, Sonora, Mexico, about 70 miles east of Hermosillo. A partly completed mill was already in existence at the site. Riebold's engineers estimated with an operation of 150 tons per day, the operation would produce net profits of $187,500 per month.

The other mine was a silver mine at Temascaltepec, Federal District, Mexico, about 100 miles southwest of Mexico City. There was a 200 tons per day mill on the property which could be purchased advantageously. Riebold's engineers estimated the net profits at $52,500 per month from the operation.

000 to Riebold and his associates. That same day, Parker made arrangements for a $200,000 loan with the Empire Bank of Springfield. Riebold agreed to pledge all his interest in the mining operation as security for the loan. Riebold testified that Parker called him in Silver City, New Mexico about a week later to tell him the $200,000 loan would go through.

Also at the board meeting of November 4, 1968, the directors voted that Parker and respondent should make a trip to Old Mexico to inspect the properties for which Riebold wanted to use the money. They were also to visit the properties in Arizona and New Mexico and bring back their opinion as to the wisdom of the loan.

Accordingly, one or two days before Thanksgiving, 1968, respondent left for Old Mexico to investigate the mines and, on Thanksgiving Day, (November 28) Parker and Crabtree left for Old Mexico to join respondent. All three men investigated the properties in Old Mexico to determine whether Riebold's investments were feasible. Respondent met with Mexican attorneys and with certain engineers to determine whether the leases on the mines were valid. The group that investigated the property in Old Mexico felt that it had a "lot of potential" because the price of silver was fair and the minimum wage at the site was $2.00 a day.

After inspecting the Old Mexico properties, Parker, respondent, and Crabtree went to Silver City, New Mexico where Parker and Riebold conducted negotiations regarding the proposed $200,000 loan from Founders to Riebold. Respondent was present during some of the negotiations and on the basis of those negotiations drafted an agreement sometime after his return to Springfield. This is the December 4, 1968 agreement.

A few days after negotiating with Parker in Silver City, Riebold, along with Ramon Rincon (an engineer and employee of Riebold's) and Ira Long, (an officer of MCA and USLM), went to Springfield. Shortly thereafter, on December 4, 1968, Founders entered into an agreement with USLM, MCA, Riebold, Rincon and two Mexican corporations owned or controlled by Riebold. The agreement called for Founders to guarantee a loan up to $200,000 to the above-mentioned parties and for Founders to execute a promissory note for repayment of the loan. The loan was to be repaid by Riebold and his companies within one year. Founders was to receive 5% of all sums due from the smelter on both the Soyopa and Temascaltepec properties.

It is the December 4, 1968 agreement, specifically paragraph 8 thereof, which forms the primary basis for the Advisory Committee's allegations.[5] In the last sen-

---

5. Paragraph 8 of said agreement provided as follows:

"8. In consideration of the payment of Ten Dollars ($10.00) and other valuable considerations, the receipt and sufficiency whereof is hereby acknowledged, and as consideration for Founders of American Investment Corporation signing said notes not to exceed an aggregate sum of Two Hundred Thousand Dollars ($200,000.00), it is agreed that E. M. Riebold and United States Lime and Mining Corporation and Metals Corporation of America will convey and assign to W. E. Parker, Lloyd R. Parker, M. W. Crabtree, Hubert Lay and Gerald H. Howther, a two per cent (2%) interest in and to all properties now owned or hereafter acquired and in any properties or assets in which an interest is secured or maintained, legal or equitable, by E. M. Riebold, United States Lime and Mining Corporation or Metals Corporation of America. It is understood and agreed that

the two per cent (2%) interest carries with it additional interest in the Morenci deal and the Klondyke deal referred to in the original contract with Founders and United States Lime and Mining Corporation and Metals Corporation of America and where they bought a fifteen per cent (15%) interest and received four per cent (4%) of the Klondyke deal and three per cent (3%) of the Morenci deal, that their interest in Morenci and Klondyke are increased proportionately. E. M. Riebold, United States Lime and Mining Corporation and Metals Corporation of America shall immediately execute the necessary documents to convey the above mentioned two per cent (2%) interest and Founders of American Investment Corporation shall be under no obligation to arrange for the borrowing of the $200,000.00 mentioned herein, or any part thereof, until these deeds, assignments and conveyances are made and delivered."

tence of paragraph 8, the $200,000 loan by Founders is conditioned on Riebold's and the corporations' first conveying a 2% interest to five of the Founders' directors. This last sentence, drafted by respondent, reads as follows:

"E. M. Riebold, United States Lime and Mining Corporation and Metals Corporation of America shall immediately execute the necessary documents to convey the above mentioned two per cent (2%) interest and Founders of American Investment Corporation shall be under no obligation to arrange for the borrowing of the $200,000.00 mentioned herein, or any part thereof, until these deeds, assignments and conveyances are made and delivered."

The "necessary documents"—namely, written assignment of interests in mining claims—were signed and acknowledged by Ira Long and Illis Harrington, Jr., each officers in both USLM and MCA on November 27, 1968. When Riebold went to Springfield to execute the December 4, 1968 agreement on behalf of himself and his two mining companies, he took with him and delivered to Parker the two written assignments of the 2% interest, with the names of the grantees left blank. Apparently these assignments were delivered to Parker either December 3 or 4 and at that time Parker's secretary typed in the names of the assignees at the direction of Parker. The five assignees were W. E. Parker, Lloyd Parker, respondent M. W. Crabtree and Hubert Lay.

It was also at this time that Riebold executed the first note guaranteed by Founders, dated December 3, 1968, and drew $152,000 on the Empire Bank of Springfield.[6]

There is little or no dispute that the facts are as set forth to this point. It is over the purpose and reason for the 2% assignment to respondent and his four associates that the dispute arises. For the facts on this aspect, we must retrace our steps slightly.

The reader will have noted that when Founders made its original investment, it paid a total of $495,000 for a 15% interest in the mining claims, or $33,000 per percentage point. When the seven directors bought in, however, they paid $250,000 for a 5% interest, or $50,000 per percentage point.

It also will be recalled that at the outset the plans were for a joint venture with Muller, which would supply the capital to put the claims into production. Expectations were high, but by October 1968 it became apparent that the joint venture with Muller would not materialize and that quick returns from the investment were not to be.

It is the position of respondent that because of the $17,000 difference per point between what the directors paid for their interest and what the corporation, Founders, paid for its and because Riebold had assured the directors that they would get their money back in six months or he would make up the difference in cost for them, Riebold was supposed to give the seven directors another 2%;[7] that that is how the 2% came to be assigned to the directors and it was not part of the $200,000 loan at all; that the consideration for Riebold's commitment was the extra $17,000 per point the directors had paid for their interest.

The Advisory Committee takes the position that the March 29, 1968 agreement where the directors bought their 5% interest for $250,000 says nothing about Riebold's being willing to equalize or adjust their cost to that of Founders; that the

---

**6.** Riebold later executed two other notes: one for $20,000, dated February 28, 1969, another for $28,000, dated May 22, 1969.

**7.** According to respondent, the reason only five of the directors got the 2% instead of all seven who had originally invested $250,000 for a 5% interest, was that two of the seven, Carter and Murrell, were unwilling to become involved any further because they feared they would be

called upon to advance additional money from time to time for operating expenses. As it turned out, their apprehension was justified. While the record does not show what the others put up, respondent testified he advanced approximately an additional $30,000 for the Mexican operation. Altogether, respondent lost about $66,000 in the entire venture.

only mention of an additional 2% is the option to purchase 2% for $100,000, good for two years; that as time went on and Riebold became desperate for operating capital, Parker and respondent used the leverage of the $200,000 loan Riebold was seeking from Founders to obtain the 2% interest from Riebold without paying anything for it.

Aside from the documentary evidence, discussed later herein, the evidence on the above question consists largely of the testimony of Parker, Riebold and respondent. Only respondent testified before the special master in person. The testimony of Parker and Riebold came from reading into the record excerpts from their testimony before the Advisory Committee during its formal investigation, where counsel was present on both sides. It developed during Riebold's testimony that he was currently serving a five year sentence in a federal institution, stemming from conviction on December 19, 1975 in a federal court in New Mexico for violation of securities laws, not related, however, to any of the transactions before us.

Parker testified as follows as to what Riebold told him:

"We was also told by Riebold on the way back to the airport [8] at the time that contract was executed that he was working on a deal on the Commonwealth claims, and he pointed to them right over there on the Santa Rita above the Kennecott pit there, which was impressive, and he was working on a deal to sell a group an interest in these claims for eight million dollars, and he said, 'We will all have our money back when I sell this claim and we will be home free, and I will guarantee I will have it done within six months.' "

According to respondent Riebold told him,

"He said we would all have our money back within six months or he would make it up to us in some manner by issuing us some additional interest and he would

guarantee it, it would happen in six months. If it did not, then he would treat us right. This is the words he told us."

" 'We're going to get our money back in six months because the Muller deal is going to be completed. They're going to pay an entrance fee. Everything will be fine. And if you don't then I'll convey you another two percent, then that will bring your cost down to about what Founders paid for their interest.' "

and

" 'I guarantee you you'll have your money back in six months, and if you don't I'll convey you another two percent to equal up your cost with what Founders paid.' "

Portions of Riebold's testimony supported respondent's position. For example, in answer to the following question:

" 'And your promise, as I understand it, was that if the Muller deal did not close in six months you would give these individuals another two percent so as to more equitably distribute their cost in the investment, is that correct?' "

Riebold replied:

" 'We had that general understanding at that time that I would fatten their position if we didn't do something.' "

and later:

" 'That two percent is something that I agreed with Mr. Parker long before this contract [the loan]. I agreed that if I did not make the Muller deal I would deliver . . . the two percent interest.' "

Riebold, referring to his negotiations with Parker, testified that,

" he [Parker] wanted some more interest in our corporation for the deal that the officers of the company put up. He wanted to fatten his position to where they weren't injured. Now, I don't remember just exactly what I said or how I said it or what I did or anything else, but I do know that that is what we agreed on and I do know that I gave them the two

8. While it is not exactly clear, apparently this conversation occurred in Silver City, New Mex-ico during the negotiations for the March 6, 1968 contract.

percent under the same circumstances. I know that.' "

On the other hand, in cross-examination, Riebold said:

"'QUESTION: You are saying—you got to the point where at one point in your testimony you said he didn't directly say you wouldn't get the loan and then you sort of paused.

"'ANSWER: Sure. Do you want me to tell you why?

"'QUESTION: Yes.

"'ANSWER: Because even though he didn't say it, and he may not have meant it, but you have to understand my position, and I in no way want to case [sic] any reflections against anyone, because that is going to get us nowhere. I needed the money, as I have told you before Mr. Parker was a tough negotiator, and I knew that I had to deliver that two percent one way or the other, and I felt like that I probably had better deliver it, but that was from Tiny Parker and—

"'QUESTION: I understand, but the reason why you assigned—

"'ANSWER: I don't want to injure someone else.

"'QUESTION: Why did you assign this two percent, because you were afraid you wouldn't get the loan?

"'ANSWER: To be perfectly honest, I didn't feel like it was going to injure me and I felt like it would be more benevolent to everybody if I didn't take any chance.

"'QUESTION: So you just wanted to be sure you got the loan and you made the assignment to get it?

"'ANSWER: I think that that would be an honest statement.' "

Riebold also testified as follows in a deposition in a suit brought by Founders against Riebold:

"'QUESTION: On these assignments . . . can you think of any reason why they should have executed . . . other than compliance with the agreement?

"'ANSWER: I don't remember why.

"'QUESTION: That would be your best guess as to why they were made?

"'ANSWER: I usually don't give anything away.' "

The special master found that Riebold had never been expressly threatened that if he didn't convey the 2% he wouldn't get the loan, but Riebold nevertheless "got the message." I am not so sure that is what happened.

The fact is that much of respondent's defense to Count I is based on hearsay—favorable testimony by him, Parker, and others as to what they said Riebold said he intended to do about the additional two per cent interest, offered to prove the truth of the matter asserted. Such hearsay is inadmissible for the purpose offered. *State v. Granberry*, 491 S.W.2d 528, 530 (Mo. banc 1973); *State v. Healy*, 562 S.W.2d 118, 125 (Mo.App.1978); cf. *State v. DeGraffenreid*, 477 S.W.2d 57, 63 (Mo. banc 1972); Missouri Evidence, 3rd Ed., The Missouri Bar (1980), § 8.1. Other than hearsay, what is left is the testimony of Riebold and respondent, plus the documents and surrounding circumstances. Respondent, of course, is personally involved; Riebold is not, although his credibility is subject to the fact of his conviction in federal court. Riebold's testimony is equivocal. Some of it is to the effect that the assignment of the 2% interest was voluntary on his part, the fulfillment of what he all along said he would do; some of it, however, indicates that he arranged for the assignment of the 2% interest because it was the price of the $200,000 loan; without it, the loan would not have been made, although this latter testimony may be subject to the interpretation that regardless of the intention of Parker and respondent, Riebold was simply not going to take any chance of jeopardizing the loan. I doubt if Riebold's testimony is sufficient to warrant a finding that respondent acted unethically. It comes close to falling in the category that when a witness says one thing on direct examination and the opposite on cross-examination, his testimony cannot be regarded as supporting either proposition. "Contradictory evidence of the same witness relied on to prove a fact does

not warrant submission of such fact in the absence of an explanation or other circumstance tending to show which of the two versions is true." *Hamilton v. Patton Creamery Co.*, 359 Mo. 526, 222 S.W.2d 713, 716 (1949).

What about paragraph 8, and particularly the last sentence thereof, appearing in the December 4, 1968 contract prepared by respondent? The language is clear and direct—without the assignment of the 2% being first made, Founders is under no obligation to proceed with the loan. If Riebold had already promised to convey the 2% interest to the directors, including respondent, and if making the assignments had nothing to do with Riebold's receiving the loan, it is most difficult to see why respondent provided for immediate execution by Riebold and his corporations of the assignments and that Founders was to be under no obligation to arrange for the $200,000 loan until the assignments were delivered. Amazingly, respondent was never asked directly and pointedly about this. Respondent's explanation that Riebold had given them an oral promise and Parker told him (respondent), "Maybe you ought to throw something in there if somewhere on down the road we have to enforce it—and that's —that's what I did," does not make very good sense. The words of the final sentence of paragraph 8 are not words of commitment on Riebold's part by which he could later be made to perform. They are words requiring an assignment now, before Founders goes any further. In addition, an acknowledgement by Riebold that he had earlier promised or intended to convey 2% would be no more than that—it would have nothing to do with the $200,000 loan and there would be no consideration for it. It would not be enforceable. As the Advisory Committee points out in its brief, the parol evidence rule would be a serious obstacle to contending that the oral promise was part of the March 29, 1968 contract or the consideration therein recited, as tacitly admitted by respondent's explanation of using the December 4, 1968 contract to get something in writing. There is no claim of fraud or duress, so that escape from the parol evidence rule under that exception is not available. Section 432.010, RSMo 1978, the statute of frauds, would also be a bar, as there was no memorandum in writing concerning the promise to convey an interest in mining lands.

So respondent either meant exactly what he wrote, which clearly amounted to using the leverage of the badly needed loan to extract the additional 2% from Riebold for respondent and his associates, or else respondent was completely unaware of the effect and consequences of the provision he drafted. Either choice is difficult. It we take the former, it means that respondent was openly engaging in unethical conduct, something almost certain to come to light, which respondent took no pains to conceal and which was known to several others. It is almost as though respondent were indifferent to whether he was openly engaging in unethical conduct, with no regard for the consequences. This I find difficult to believe.

On the other hand, for respondent not to have realized the apparent tenor and significance of the way paragraph 8 was worded, particularly the last sentence, calls for abysmal denseness on the part of respondent. This, too, I find difficult to believe of a lawyer with respondent's credentials.

The circumstances, too, are equivocal. The assignments of the 2% interest were dated and acknowledged November 27, 1968, which was prior to the signing of the December 4 contract, consistent with their not being a condition of the loan. On the other hand, the assignments were not delivered to Parker until on or about the day of the signing of the contract, which is consistent with their being a requirement for the loan. Parker was unable to give any explanation why, if he had the assignments prior to the signing of the December 4 contract and if the loan had nothing to do with the assignments, paragraph 8 was in the contract. The first part of the $200,000 loan— $152,000—was formalized December 3, 1968, by a note signed that date, which was actually a day before the December 4, 1968 contract. From this it might be said that

paragraph 8 did not operate to put pressure on Riebold. But, on the other hand, the balance of the $200,000 loan was not turned over to Riebold until March 3, 1969 and May 22, 1969, when notes for $20,000 and $28,000 respectively, were signed, which was long after the assignments had been delivered, recorded, and in all respects put beyond recall by Riebold. But Parker and Founders agreed on November 4, 1968 to make Riebold the $200,000 loan, so it could be said that the assignment of the 2% interest was not a condition precedent at all. On the other hand, the November 4 decision was merely a declaration of intent by Founders, not a binding obligation. The money was not forthcoming until a month later, by which time the assignments were in Parker's hands.

Out of all this, what we are left with is the conviction that there is not sufficient proof here to say with confidence that the charge is proven. "We have here a state of facts where a reasonable mind might conjecture that one thing happened, another that something else happened, and a third might not agree with either. Sound reasoning, however, does not point to the liability of the defendant to the exclusion of other causes. A verdict cannot be sustained by such evidence." *Bates v. Brown Shoe Co.*, 342 Mo. 411, 116 S.W.2d 31, 33 (1938). The burden of proof that respondent violated any disciplinary rule rests upon the committee. The evidence and the reasonable inferences therefrom are too uncertain and equivocal to warrant our finding that respondent is guilty on Count I.

## II

As initially noted, it is very questionable whether or not disputes between law partners as to the division of fees is a matter of "ethical" concern for this Court. At this moment, I do not believe that they are.

## III

A proceeding such as this is not to punish an attorney but to protect the public. *In re Randolph*, 347 S.W.2d 91, 109[2] (Mo. banc 1961); *In re O'Brien*, 478 S.W.2d 310, 312 (Mo. banc 1972). I personally think that the questioned activity was an "in-house" operation, with little interest or concern by the public. Even if that thought is erroneous, whatever happened was twelve years ago and there is no *present need to protect the public*. Conduct of respondent as an outstanding attorney at law, otherwise, proves as much.

## IV

If there *must be* "punishment", certainly a reprimand would be adequate.